## IN THE UNITED STATE DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**ANDREW T. MILLER,**

**Plaintiff,**

v.

Civ. Act. No. __2:23-cv-304__

**Jury Trial Requested**

**WILLIAM K. MARSHALL, MEDINA PRUE,**
**LESLIE HILL, MISTY ADAMS,**
**RUSSELL MASTON, MELISSA KIMBLE,**
**JOHN DOES 1-10, and JANE DOES 1-10,**

**Defendants.**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.      JURISDICTION

1.      This action arises under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-2.

2.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

3.      The Plaintiff seeks declaratory and injunctive relief as authorized by 28 U.S.C. §§ 2201 and 2202.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the acts and omissions of which Plaintiff complains occurred in this District and the Defendants reside in this District.

### II.      PARTIES

5.      Plaintiff Andrew T. Miller (OID # 3634462) is an inmate in the custody of the West Virginia Division of Corrections and Rehabilitation (WVDCR) while serving a 1-10 year, nondeterminative sentence for breaking and entering. At time of filing, Mr. Miller is incarcerated

at Saint Marys Correctional Center and Jail (Saint Marys or SMCC), a facility operated by WVDCR in Saint Marys, Pleasants County, West Virginia.

6.      Defendant William K. Marshall is the Commissioner of the WVDCR and is sued in his official capacity. Defendant Marshall's office is located at 1409 Greenbrier Street, Charleston, West Virginia.

7.      Defendant Medina Prue is the RSAT Program Manager for the WVDCR and is sued in her official capacity. Defendant Prue's office is located at 1409 Greenbrier Street, Charleston, West Virginia.

8.      Defendant Leslie Hill is the Director of Classification for the WVDCR and is sued in her official capacity. Defendant Hill's office is located at 1409 Greenbrier Street, Charleston, West Virginia.

9.      Defendant Misty Adams is the Deputy Director of Programs for the WVDCR and is sued in her official capacity. Defendant Adams' office is located at 1409 Greenbrier Street, Charleston, West Virginia.

10.      Defendant Russel Maston is the Superintendent of SMCC and is sued in his official capacity. Defendant Maston's office is located at 2880 North Pleasants Highway, Saint Marys, West Virginia.

11.      Defendant Melissa Kimble is the RSAT Unit Manager at SMCC and is sued in her official capacity. Defendant's office is located at 2880 North Pleasants Highway, Saint Marys, West Virginia.

### III.      STATEMENT OF FACTS

**The West Virginia Division of Corrections and Rehabilitation**

***Structure of the West Virginia Division of Corrections and Rehabilitation***

12.     The WVDCR, a division of the West Virginia Department of Homeland Security and oversees "all functions of correctional operations" that were previously within the authority of the Regional Jail and Correctional Facility Authority Board.

13.     In the 2022 fiscal year, the WVDCR received at least $348,065 in federal funding. *See* "West Virginia's FY 2022 Residential Substance Abuse Treatment Program," Bureau of Justice Assistance (Aug. 12, 2022), https://bja.ojp.gov/funding/awards/15pbja-22-gg-00513-rsat; "FY 2022 Prison Rape Elimination Act Reallocation Award," Bureau of Justice Assistance (Aug. 31, 2022), https://bja.ojp.gov/funding/awards/15pbja-22-gg-01112-jagp.

14.     Defendant Marshall, as the Commissioner of the WVDCR (Commissioner), is the executive and administrative head of the division, W. Va. Code § 15A-3-2(a), with the statutory authority to, among other things:

a.     "Establish rules, policies, and regulations in writing governing all subdivisions and institutions within the division, § 15A-3-4(3);

b.     "Establish an appropriate training program for personnel of the division, § 15A-3-4(4);

c.     "Establish a system of classification of inmates and residents, through a reception and examination procedure, § 15A-3-4(6);

d.     "Supervise the treatment, custody, and discipline of all inmates and residents and the maintenance of the institutions and their industries, § 15A-3-4(8); and

e.     "Investigate any complaint made against the superintendent of any institution, and against any other officer or employee thereof, if the same has not been investigated." § 15A-3-5(c)

15. The WVDCR Department of Classification for Prisons is responsible for offender classification and offender movement within the WVDCR.

16. Defendant Hill, as the Director of Classification, oversees the operations of the Department of Classification.

17. Upon information and belief, some degree of Defendant Hill's authority over inmate classification has been delegated to Defendant Misty Adams, WVDCR Deputy Director of Programs.

18. The Department of Classification conducts regular assessments of inmates and determines the elements of each inmate's Individual Reentry Program Plan (IRPP).

19. Except in limited circumstances, inmates that have not fulfilled all elements of their IRPP will not be granted parole.

### WVDCR Inmate Grievance Procedure

20. The WVDCR has promulgated an administrative procedure for incarcerated people who seek a remedy for alleged wrongdoing. Policy Directive 335.00 describes the Inmate Grievance Procedure.

21. An inmate may file a grievance using forms provided by WVDCR. Each separate wrong must be reported on a separate form and submitted to the inmate's Unit Manager.

22. The Unit Manager is required to respond to the grievance within five days. The inmate may treat the Unit Manager's failure to respond as a denial and proceed to the next level of review.

23. The inmate may appeal the Unit Manager's response to the Superintendent of the respective facility within five days from receipt of the response from the Unit Manager. Like the

Unit Manager, the Superintendent has five days to respond to the appeal. Failure to respond constitutes a constructive denial.

24.     Within five days of receiving the Superintendent's response (or within five days of the date by which the Superintendent was required to respond), the inmate may appeal the Superintendent's decision to the Commissioner of the Division of Corrections. The Commissioner has ten days to respond to the appeal.

25.     According to Policy Directive 335.00, "'[e]xhaustion' shall mean submitting an accepted grievance and properly appealing an accepted grievance fully and receiving a final response thereto by the Commissioner."

### *WVDCR's Residential Substance Abuse Treatment Program*

26.     The WVDCR operates a Residential Substance Abuse Treatment (RSAT) Program with the support of federal funding through the Residential Substance Abuse Treatment for State Prisoners Program (RSAT Grant Program) established by the Violent Crime Control and Law Enforcement Act of 1994.

27.     The RSAT Grant Program makes federal funding available to states "for the purpose of—(1) developing and implementing residential substance abuse treatment programs within State correctional facilities, as well as within local correctional and detention facilities in which inmates are incarcerated for a period of time sufficient to permit substance abuse treatment[.]" 34 U.S.C. § 10421(a).

28.     The WVDCR RSAT Program Manager, Defendant Prue, oversees the operations of West Virginia's RSAT Program and administers federal funds disbursed to WVDCR through the RSAT Grant Program.

29.    The WVDCR houses people participating in the RSAT Program separately from the general population, in specially designated RSAT Units.

30.    The WVDCR RSAT Program operates 10 RSAT Units at corrections facilities around the state, including SMCC, Beckley Correctional Center and Jail (Beckley or BCC), and Parkersburg Correctional Center and Jail (Parkersburg or PBCC).

31.    Each RSAT Unit is overseen by an RSAT Unit Manager who directs the operations of each individual unit.

32.    In practice, each RSAT Unit Manager relies on a group of RSAT "Elders," inmates who have already completed the RSAT program, and "Coordinators" to run the day-to-day details of the RSAT Unit.

33.    Participation in the RSAT program is limited to incarcerated people assessed to be at a "high risk" to recidivate. 2016 WVDCR RSAT Recidivism Rep. at 1.

34.    An inmate's risk of recidivism is determined by a Level of Service/Case Management Inventory (LS/CMI) assessment conducted upon each inmate's incarceration and updated at regular intervals.

35.    The Deputy Director of Programs, Defendant Misty Adams, uses the LS/CMI assessment to determine each inmate's programming needs when developing their Individual Reentry Program Plan (IRPP).

36.    An inmate's completion of the programs and other elements of their IRPP, including RSAT, is necessary for the inmate to be granted parole.

37.    An inmate's LS/CMI assessment is also used by Defendant Hill when assigning inmates to facilities and transferring them within the WVDCR.

38.     Upon information and belief, the Director of Classification assigns and transfers inmates between facilities using a point system. The points assigned to an inmate are used to determine, among other things, the security level at which an inmate is to be housed.

39.     Refusal to participate in required programs, including RSAT, results in two points being assessed against the inmate.

*The Residential Substance Abuse Treatment Handbook*

40.     Every participant in the RSAT Program is provided with a copy of the Residential Substance Abuse Treatment Handbook (Handbook). The Handbook and its contents are approved by the RSAT Program Manager and is distributed by the WVDCR.

41.     The September 2016 edition of the Handbook states on the cover that its purpose "is to give you [the inmate] orientation to the general information, rules, and regulations" of the RSAT Program. "This is a summary of what is expected of you while you are here. . . . Do not hesitate to ask questions of your Crew Coordinator, Senior Coordinator or Staff."

42.     The Crew Coordinator and Senior Coordinator are positions held by other inmates.

43.     The first page of the September 2016 edition of the Handbook contains a "Welcome" message that concludes, "Please see inserts to find Unit Mission, Schedule, Philosophy, Oath, Creed and Prayer."

44.     The inserts accompanying the Handbook include, among other things, the Lord's Prayer, Twelve Promises, Twelve Traditions, the Serenity Prayer, and the Twelve Steps accompanied on the same page by another copy of the Serenity Prayer.

45.     The Twelve Promises insert includes: "12. We will suddenly realize that God is doing for us what we could not do for ourselves."

46.     The Twelve Traditions insert includes: "2. For our group purpose there is but one ultimate authority; a loving God as he may express Himself in our group conscience. Our leaders are but trusted servants; they do not govern."

47.     The Twelve Steps insert includes:

3. Made a decision to turn our will and our lives over to the of God as we understood him. . . .

5. Admitted to God, to ourselves, and to another human being the exact nature of our wrongs.

6. We were entirely ready to have God remove all these defects of character.

7. Humbly asked him to remove our short comings. . . .

11. Sought through prayer and meditation to improve our conscious contact with God as we understood him, praying only for knowledge of His will for us and the power to carry that out.

48.     On page 23, under the heading "The Role of Staff," the Handbook states that "Staff members are the only individuals with 'authority' over others in our community." Under the heading "Roles and Responsibilities," the Handbook further states that "[o]nly Treatment staff can make program decisions and determine responsibilities. Therefore, community members must obtain staff approval for everything that takes place."

*The five phases of the WVDCR RSAT program*

49.     Participating inmates progress through five phases over the course of the program, which lasts at least six months and may last as long as 12.

50.     To "phase-up" from one phase to the next, each participant must complete an application and answer test questions.

51.     Phase 1 of the RSAT Program, Acclimation, is a 2-to-4-week phase in which the individual is introduced to the community and the healthy community lifestyle.

52.     The Phase II Application requires participants to check off that they have, among other things "[d]emonstrate[d] knowledge of steps 1-4 of the '12 Step Program,'" "[a]ttended (5) AA/NA Meetings," and completed an assessment devised by Texas Christian University (TCU).

53.     An inmate must therefore "demonstrate knowledge of" Step Three, which reads: "Made a decision to turn our will and our lives over to the care of God as we understood him," to advance from Phase 1 to Phase 2.

54.     Phase 2 of the RSAT Program, Orientation, is a 1-to-3-month phase in which the individual is immersed into the community lifestyle and begins to practice the behaviors, attitudes, and values promoted by the community.

55.     The "Phase-up Test 2-3" requires participants to answer a number of questions, including: "What is step two of AA?" and "What is step four of AA?" Two questions in the "Bonus" section instruct participants to "Name one of the twelve promises of AA" and "Name one of the twelve rewards of sobriety for AA[.]"

56.     Phase 3 of the RSAT Program, Primary Treatment, is a 4-to-6-month phase in which the community is the major agent of change for the participant through daily interactions with community members and staff. The goal of this phase is socialization through positive peer relations, substance use disorder (SUD) treatment, and addressing specific criminogenic risks and needs.

57.     The Phase IV Application requires "[r]ecit[ation of] the Unit Philosophy and Prayer," "[a]ttend[ing] (50) AA/NA meetings," and "[k]nowledge [of] Steps 9-12 of the '12 Step Program.'"

58.     Phase 4 of the RSAT Program, Practicum, is a 2-to-4-week phase in which the individual has an opportunity to live a healthy lifestyle with appropriate structure and demonstrate

competency regarding community attitudes, behaviors, and values. Participants in this phase of programming can be retained by the community for mentoring purposes for up to 18 months. Participants who successfully complete this phase should begin continuing care/reintegration planning.

59.    Phase 5 of the RSAT Program, Transition, is a phase of indeterminate length that focuses on maintaining a healthy lifestyle and preparing to transition into continuing care, either within the Division of Corrections and Rehabilitation or in the community. Participants in this phase of programming may also be retained by the community for mentoring purposes. To achieve phase 5, the participant must successfully complete phases 1 through 4.

*Religious coursework and exclusive focus on the Twelve Steps*

60.    According to the Handbook, the inmate assigned the job of Education Coordinator has a responsibility to, among other things, "[p]rovide tutorial sessions/classes for one hour twice per week with individuals needing instruction."

61.    In order to perform this function, the Education Coordinator is provided with material for a number of courses, including "Mapping Your Steps," "Ideas for Better Communications," "Understanding and Reducing Angry Feelings," "Getting Motivated to Change," and "Unlock Your Thinking Open Your Mind."

62.    The courses "Mapping Your Steps," "Ideas for Better Communications," "Understanding and Reducing Angry Feelings," "Getting Motivated to Change," and "Unlock Your Thinking Open Your Mind," as well as others delivered as part of the RSAT Programs mandatory courses, were developed by TCU. The TCU-provided materials utilized in the courses not only strongly promote the "Twelve Steps" of Alcoholics Anonymous and Narcotics Anonymous but frame the topics from a specifically Evangelical Christian worldview.

63.    The "Mapping Your Steps" course, as an example of a typical course, contains "maps" designed to inculcate each of the Twelve Steps.

64.    In order to complete the maps for Step Three, participants must respond to a number of prompts about "GOD," including: "This is what <u>God</u> means to me," "This is what I think God is like," "This is how God takes care of me (or could take care of me)," and "This is a picture that shows how I feel (or would feel) while being taken care of by God. (Draw or Describe.)"

65.    To complete the maps for Step Eleven, participants must respond to a number of prompts, including "This is what <u>prayer</u> means to me," "This is what <u>knowledge of His will</u> means to me," and "This is an example of something God wants me to do."

66.    The Twelve Steps and the principles of Twelve Step programs are described in the "Big Book." Alcoholics Anonymous: The Story of How Many Thousands of Men and Women Have Recovered from Alcoholism 44-46 (4th ed. 2001). Chapter 4 of the Big Book, entitled "We Agnostics," tells atheists and agnostics they are "doomed to an alcoholic death" unless they "seek Him." Alcoholics Anonymous: The Story of How Many Thousands of Men and Women Have Recovered from Alcoholism 44-46 (4th ed. 2001). The chapter goes on to deride the nonreligious as "handicapped by obstinacy, sensitiveness, and unreasoning prejudice." *Id.* at 48. It even propounds the dismissive fallacy that "in every man, woman, and child, is the fundamental idea of God." *Id.* at 55.

*Daily activities in an RSAT Unit*

67.    In the RSAT Unit at SMCC, each day begins at 7:30 am with a "feet on the floor" call.

68.    At 8:00 am, all participants gather for the "morning devotional" (AMD), in which they discuss the "Thoughts of the Day," "Step of the Day," "RSAT Concept of the Day," and

"RSAT Term of the Day" or "RSAT Value of the Day," that are all listed on the Thought of the Day board in the RSAT Unit common area for throughout the day.

69.     During AMD, participants are expected to discuss the various items on the board with their peers and, in particular, expound on the "Step of the Day."

70.     At 10:00 am, the participants receive any medication they are prescribed followed sometimes by a brief period to clean the RSAT Unit.

71.     At 11:00 am, the participants have lunch.

72.     At 12:00 pm, SMCC staff conduct a count.

73.     At 1:00 pm, the participants have recreational time.

74.     At 2:00 pm, the participants attend the day's group event, which could include a discussion, delivery of an assigned presentation, or a graduation.

75.     At 3:00 pm, the participants gather for afternoon devotional (PMD) where they again discuss the ideas presented on the "Thoughts of the Day" board and engage in rote call-and-response exercises.

76.     At 4:00 pm, the participants attend either an Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meeting. Each meeting of either AA or NA starts and ends with the Lord's Prayer and the Serenity Prayer, respectively.

77.     At 5:00 pm, the participants have dinner.

78.     Between roughly 6:00 pm and 7:00 pm, the participants have recreation time.

79.     At 7:00 pm, SMCC staff conduct a second count.

80.     At 9:00 pm, the participants again receive any medication they are prescribed.

81.     Although this schedule varies between WVDCR facilities, the activities are substantively the same at all WVDCR RSAT Units.

**Andrew Miller**

82.     Andrew T. Miller is serving a 1-10-year, non-determinate sentence for breaking and entering. He was sentenced on September 21, 2020. The earliest he will be eligible for release without parole is April of 2025.

83.     Andrew is an atheist and Secular Humanist and has identified as such since August of 2020. He does not believe in any deity or higher power, nor does he believe that the Universe, science, or any other abstract concepts have agency or willpower to which he could conceivably submit.

84.     Andrew believes in helping others because it is the right thing to do.

85.     He is a recovering addict and believes in the disease model of addiction. He previously received secular substance use disorder treatment for his addiction in the form of Vivitrol and therapy. These methods helped him maintain his sobriety for four years.

86.     Although substance use was not a factor in his offense, he is required to complete the RSAT Program in order to be eligible for parole. The RSAT Program was included in his IRPP as a result of an LS/CMI assessment conducted during the intake process following his sentencing.

87.     During his incarceration, Andrew participated in the RSAT Program and has been housed in the RSAT Units at SMCC, PBCC, and BCC.

88.     From approximately June 1 to approximately July 15, 2021, he was incarcerated in SMCC. While there, he participated in the RSAT program for approximately five days.

89.     From approximately July 15, 2021, to approximately May 10, 2022, he was incarcerated in PBCC.

90.     While incarcerated at PBCC, Andrew participated in the RSAT Program twice: first from September to November, 2021, and again in early May of 2022.

91.     In early May of 2022, he was in Phase 3 of the RSAT Program, Primary Treatment.

92.     From approximately May 10 to approximately June 16, 2022, he was incarcerated at BCC.

93.     Andrew initially agreed to continue participating in the RSAT Program at BCC. However, after learning that he would be returned to Phase 1 of the RSAT Program, he declined to continue.

94.     From approximately June 16 and September 9, 2022, he was incarcerated at PBCC.

95.     From September 9, 2022, until the filing of this complaint, Andrew has been incarcerated at SMCC.

*Andrew's experience in the RSAT Program*

96.     The content of the RSAT Program in the RSAT Units Andrew resided in at SMCC, PBCC, and BCC is substantively identical.

97.     Upon first entering the RSAT Program at SMCC in June 2021, it immediately became apparent to Andrew that the program was pervasively religious.

98.     The "Thoughts of the Day," "Step of the Day," and other material on the "Thoughts of the Day" board were often theistic in nature and almost always expressed a specifically Christian belief.

99.     During AMD and PMD, Andrew and the other participants were required to discuss and ruminate on these ideas.

100.    The meeting space in the RSAT unit makes a selection of reading material available. The materials are almost entirely religious in nature and no religious viewpoints other than Christianity are represented.

101.    RSAT Elders assigned him the job of Education Coordinator (EC) soon after he began participating in the RSAT Program.

102.    As EC, he was required to present courses to other RSAT Program participants. He was provided with materials for the courses he was assigned to instruct, including "Ideas for Better Communications," "Understanding and Reducing Angry Feelings," "Getting Motivated to Change," and "Unlock Your Thinking Open Your Mind," all developed by TCU and promoting specifically a Christian worldview and a reliance on the Twelve Steps.

103.    In addition to the TCU-developed courses he was required to present as EC, he was allowed to develop his own course, Providing Answers for Transitioning Home (PATH) and deliver it to RSAT program participants.

104.    During his participation in the RSAT Program, Andrew attended at least 18 AA or NA meetings.

105.    While Andrew incarcerated at PBCC, a participant painted various sayings, such as "LET GO AND LET GOD" and "DO YOUR BEST AND LET GOD DO THE REST" on the walls. The painted phrases remained on the walls at least until Andrew was transferred from PBCC several months later.

*Andrew's requests for an accommodation*

106.    Shortly after first enrolling in the RSAT program at SMCC, in July of 2021, Andrew withdrew from the program as a result of the pervasive religious elements.

107.    In early July 2021, Andrew learned that he was classified as "Christian" in the Offender Information System despite the fact that he never identified himself as Christian to any WVDCR official and he had identified as atheist and Secular Humanist prior to his sentencing.

108.    At Andrew's request, his classification was changed to atheist on July 13, 2021.

109.    On July 12, 2021, in a letter to then-Commissioner Betsy Jividen, he objected to the religious nature of the RSAT program and requested that it be removed from his Individual Reentry Program Plan (IRPP). As an accommodation, he suggested that he could receive substance abuse treatment through PSIMED and participate in the Cognitive Behavioral Intervention for Substance Abuse (CBISA) and Thinking for a Change classes (courses also provided through the RSAT program) without also being subjected to the religious elements found in the other parts of the RSAT Program.

110.    On July 22, 2021, Defendant Prue responded to Andrew's letter to then-Commissioner Jividen. In her letter, Defendant Prue acknowledged that Andrew was classified as an atheist but nevertheless denied his request for an accommodation.

111.    On July 23, 2021, Andrew filed Grievance No. 21-PBCC-86-0021 (Grievance I) with his PBCC Unit Manager, Jason Larsen, requesting that the RSAT program be removed from his IRPP. Unit Manager Larsen denied his request the same day.

112.    On July 25, 2021, he filled an additional grievance, Grievance No. 21-PBCC-86-0023 (Grievance II), requesting the opportunity to sign up for CBISA and Thinking for a Change without participating in the larger RSAT program.

113.    On July 26, 2021, he appealed Mr. Larsen's denial of Grievance I to the Superintendent, Aaron Westfall. Superintendent Westfall concurred with Mr. Larsen's decision on July 27, 2021.

114.    Also on July 27, 2021, Mr. Larsen denied Grievance II.

115.    Also on July 27, 2021, Andrew spoke directly with Defendant Prue and reiterated his request for an accommodation. She responded that inmates do not get to dictate the classes they take and prevailed upon him to reenter the RSAT program.

116.    On July 29, 2021, he appealed Grievance I to the Office of the Commissioner. That appeal was denied in a letter dated August 11, 2021.

117.    Also on July 29, 2021, he appealed Grievance II to Superintendent Westfall, who denied his appeal on July 30, 2021.

118.    On August 3, 2021, Andrew appealed Grievance II to the Office of the Commissioner. That appeal was denied on August 12, 2021.

119.    On March 7, 2022, in light of the lack of any attempt to accommodate his beliefs, Andrew wrote to Leslie Hill, the WVDCR Director of Classification to again request that RSAT be removed as a required part of his IRPP.

120.    In a letter dated March 17, 2022, Defendant Adams responded by denying his request and providing him with a single sheet of paper titled "A Humanist Alternative to AA's Twelve Steps." This does not sufficiently accommodate Andrew's sincerely held beliefs because it does nothing to address the numerous religious aspects of the RSAT program that he would still be required to participate in in order to be eligible for parole.

121.    On May 28, 2022, he filed Grievance 22-BCC-RSAT-23 (Grievance III), describing his efforts to obtain an accommodation, the lack of any meaningful accommodation, and once again requesting that completion of the RSAT program be removed from his IRPP. His Unit Manager, Gary Webb, denied Grievance III as duplicative of Grievance I.

122.    On August 8, 2022, he filed Grievance No. 22-PBCC-86-0038 (Grievance IV) in which he requested an opportunity to complete the RSAT program without being coerced to engage in religious activity and proposed that this be accomplished by providing access to Humanist reading material and secular substance abuse treatment alternatives to AA and NA, such as LifeRing.

123.   Unit Manager William Westfall denied his request on August 8, 2022.

124.   In a letter dated August 9, 2022, William Westfall responded to his grievance and informed him that a secular handbook is available to inmates who request it. This was the first time such a handbook was mentioned by any WVDOCR official. Moreover, such an accommodation would not be sufficient as it would do nothing to address the numerous religious aspects of the RSAT program that he would still be required to participate in in order to be eligible for parole.

125.   On August 11, 2022, he appealed his Unit Manager's denial of Grievance IV. That appeal was denied by Superintendent Aaron Westfall on August 15, 2022.

126.   On August 15, 2022, he appealed that further denial to the Office of the Commissioner. That appeal was denied on August 18, 2022.

127.   On October 19, 2022, after he was transferred from PBCC back to SMCC, he filed Grievance No. 22-SMCC-83-1-59 (Grievance V). This grievance was denied by his Unit Manager on October 20, 2022, as duplicative of Grievance IV.

128.   Despite his repeated requests for accommodation, as of the filing of this action, the purported secular handbook has never actually been provided to Andrew and the only action WVDCR has ever taken to address his objections was to provide him with the single-page "A Humanist Alternative to AA's Twelve Steps."

*Andrew denied parole for failure to complete RSAT*

129.   Andrew has been denied parole multiple times.

130.   On December 3, 2021, Andrew was interviewed by the Parole Board Panel and given a Deferred/Contingent Status, subject to obtaining an approved place of residency and completing RSAT.

131.    On July 26, 2022, Andrew was again interviewed and denied parole. The Parole Decision Summary provided to Andrew stated that "at your next interview, the Board will review your file and consider whether you have successfully participated in/completed the required treatment program for RSAT."

132.    On October 18, 2022, Andrew was interviewed by the Parole Board Panel and denied yet again. The Parole Decision Summary provided to Andrew listed as a factor "Whether you have successfully participated in/completed the required treatment program for: RSAT[.]" The "List of Factors" included "You need to complete required DOC programs" and "Your unsuccessful participation in risk reducing programs[.]"

133.    Parole officials have verbally told him that he will need to complete the RSAT Program in order to meet these requirements.

## IV.    CAUSES OF ACTION

### Count I – RLUIPA
### (42 U.S.C. § 2000cc-2)

134.    Plaintiff reasserts all previous paragraphs.

135.    The Religious Land Use and Institutionalized Persons Act (RLUIPA) prohibits the government from imposing a substantial burden on an inmate's exercise of his or her sincerely held beliefs unless the burdening act is the least restrictive means of achieving a compelling government interest.

136.    The Defendants' actions put the Plaintiff to the impossible choice of either violating his sincerely held beliefs by engaging in religious activities that run counter to his own beliefs or forfeiting the possibility of parole.

137.    By failing to accommodate the Plaintiff's exercise of his sincerely held beliefs, the Defendants imposed a substantial burden on those beliefs.

138.    The Defendants' failure to provide a secular alternative to the numerous religious elements of the RSAT Program furthers no compelling government interest, nor would such a burden be the least restrictive means of achieving any compelling government interest.

139.    Because the Plaintiff can show that his sincerely held beliefs have been substantially burdened and the Defendants cannot meet the stringent standard required by RLUIPA, the Defendants' actions violated the Plaintiff's statutory rights.

140.    Declaratory judgment and injunctive relief directing the Defendants to make secular alternatives to all religious elements of the WVDCR's RSAT Program are necessary to prevent further violation of the Plaintiff's rights.

### Count II – Establishment Clause of the First Amendment
### (42 U.S.C. § 1983)

141.    Plaintiff reasserts all previous paragraphs.

142.    The Establishment Clause of the First Amendment, as incorporated to the states by the Due Process Clause of the Fourteenth Amendment, prohibits the government from coercing an individual into engaging in religious activity.

143.    By imposing the pervasively religious elements of the RSAT Program on the Plaintiff as a necessary condition for parole eligibility, the Defendants used the coercive power of the state to force the Plaintiff to engage in the exercise of religion in violation of the Establishment Clause.

144.    The religious elements of WVDCR's RSAT Program are present throughout the program, demonstrating that the violation is part of a policy, practice, or custom that resulted in the injury.

145.    Declaratory judgment and injunctive relief directing the Defendants to make secular alternatives to all religious elements of the WVDCR's RSAT Program are necessary to prevent further violation of the Plaintiff's rights.

### Count III – Free Exercise Clause of the First Amendment
### (42 U.S.C. § 1983)

146.    Plaintiff reasserts all previous paragraphs.

147.    The Free Exercise Clause of the First Amendment, as incorporated to the states by the Due Process Clause of the Fourteenth Amendment, prohibits the government from imposing burdens on an individual's free exercise of religion as a result of hostility toward the individual's sincerely held beliefs.

148.    The Defendants' actions placed Twelve Step programs at the center of the RSAT program and its religious elements are pervasive.

149.    Twelve Step Programs are explicitly hostile toward atheists, agnostics and the nonreligious, as evidenced by numerous statements in the "Big Book."

150.    By forcing the Plaintiff to participate in a program expressly hostile to his beliefs and by refusing to accommodate the Plaintiff's exercise of his own sincerely held beliefs, the Defendants imposed a substantial burden on those beliefs.

151.    The Defendants' failure to provide a secular alternative to the numerous hostile, religious elements of the RSAT Program furthers no compelling government interest, nor would such a burden be the least restrictive means of achieving any compelling government interest.

152.    The religious elements of WVDCR's RSAT Program are present throughout the program, demonstrating that the violation is part of a policy, practice, or custom that resulted in the injury.

153.   Declaratory judgment and injunctive relief directing the Defendants to make secular alternatives to all religious elements of the WVDCR's RSAT Program are necessary to prevent further violation of the Plaintiff's rights.

## Count IV – Free Speech Clause of the First Amendment
### (42 U.S.C. § 1983)

154.   Plaintiff reasserts all previous paragraphs.

155.   The Free Speech Clause of the First Amendment, as incorporated to the states by the Due Process Clause of the Fourteenth Amendment, prohibits the government from compelling an individual to engage in expressive activity.

156.   Defendants' actions forced Plaintiff, in his capacity as an Education Coordinator in the RSAT Program, to deliver religious course materials that he fundamentally disagreed with.

157.   Defendants' actions put Mr. Miller to the choice of delivering the government's preferred message or forfeit his eligibility for parole.

158.   The Defendants' practice of assigning RSAT Program participants the position of Education Coordinator and demanding they deliver the government's required coursework or forfeit their parole eligibility is present throughout the RSAT Program, demonstrating that the violation is part of a policy, practice, or custom that resulted in the injury.

159.   Declaratory judgment and injunctive relief directing the Defendants to make secular alternatives to all religious elements of the WVDCR's RSAT Program are necessary to prevent further violation of Plaintiff's rights.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in their favor and grant the following relief:

a.      Declare that the WVDCR's RSAT Program as it is currently constituted is pervasively religious;

b.      Declare that the religious elements of the WVDCR's RSAT Program are the result of governmental policy, practice, or custom;

c.      Declare that the Defendants' failure to provide an accommodation in the form of secular alternatives to all religious elements in the RSAT Program violates the Religious Land Use and Institutionalized Persons Act, and the Establishment and Free Exercise Clauses of the First Amendment;

d.      Declare that the Defendants' failure to accommodate Plaintiff Andrew Miller's sincerely held beliefs compelled him to engage in expressive activity in order to deliver the governments preferred message in violation of the Free Speech Clause of the First Amendment;

e.      Issue an injunction directing the Defendants to immediately make secular alternatives to all religious elements in the RSAT Program available to RSAT Program participants;

f.      Issue an injunction directing the Defendants to immediately remove the RSAT program from the Plaintiff's IRPP;

g.      Award Plaintiff reasonable costs and expenses, including attorneys' fees for this action, under the Religious Land Use and Institutionalized Persons Act and 42 U.S.C. § 1988(b) and any other applicable provisions of law or powers of the Court; and

h.      Grant any other relief that the Court may deem just and proper.

**Respectfully submitted,**
**ANDREW MILLER,**

By counsel,


/s/Lydia C. Milnes
Lydia C. Milnes (WVSB #10598)
Lesley M. Nash (WVSB #14158)
Mountain State Justice, Inc.
1029 University Ave., Ste. 101
Morgantown, WV 26505
Phone: (304) 326-0188
Facsimile: (304) 326-0189
lydia@msjlaw.org
lesley@msjlaw.org



Geoffrey Blackwell (NJ #120332014)*
American Atheists, Inc.
2001 Columbia Pike, #212
Arlington, VA 22204
Phone: (908) 603-8787
Facsimile: (908) 276-7402
legal@atheists.org

*pro hac vice pending