IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ANDREW T. MILLER,

                Plaintiff,

v.                                 CIVIL ACTION NO.   2:23-cv-00304

WILLIAM K. MARSHALL, et al.,

                Defendants.

MEMORANDUM OPINION AND ORDER

Pending before the court is Plaintiff's Motion for Preliminary Injunction [ECF No. 5], and Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [ECF No. 13].

The question presented by this case is whether the state of West Virginia may validly require incarcerated individuals, as a condition of eligibility for parole, to complete a substance abuse treatment program alleged to involve pervasive religious elements. Despite its longstanding nature, West Virginia's program has never previously faced judicial scrutiny. In other states, however, numerous courts have reviewed similar programs and unanimously found them to contain "such substantial religious components that governmentally compelled participation in [them] violate[s] the Establishment Clause." *Inouye v. Kemna*, 504 F.3d 705, 714 n.9 (9th Cir. 2007) (Hawaii); *see, e.g.*, *O'Connor v. State of Cal.*, 855 F. Supp. 303, 308 (C.D.

Cal. 1994) (California); *Kerr v. Farrey*, 95 F.3d 472 (7th Cir. 1996) (Wisconsin); *Griffin v. Coughlin*, 673 N.E.2d 98 (N.Y. 1996) (New York); *Arnold v. Tenn. Bd. of Paroles*, 956 S.W.2d 478 (Tenn. 1997) (Tennessee); *Ross v. Keelings*, 2 F. Supp. 2d 810 (E.D. Va. 1998) (Virginia); *Jackson v. Nixon*, 747 F.3d 537 (8th Cir. 2014) (Missouri); *Janny v. Gamez*, 8 F.4th 883 (10th Cir. 2021) (Colorado). At this juncture, I have been provided with no evidence that West Virginia's program is any less religious or less coercive than the programs invalidated in other jurisdictions. Having determined that Plaintiff is likely to succeed on the merits, his Motion for Preliminary Injunction [ECF No. 5] is **GRANTED**, and Defendants' Motion to Dismiss [ECF No. 13] is **DENIED**.

## I.   Background

Plaintiff Andrew Miller, an inmate in the custody of the West Virginia Division of Corrections and Rehabilitation ("WVDCR"), alleges that he "has been denied parole at least in part because of his refusal to participate in religious exercises that violate his beliefs." [ECF No. 6, at 1]. Mr. Miller is "an atheist and Secular Humanist" who objects to the "pervasively religious" nature of the Residential Substance Abuse Treatment ("RSAT") program administered by WVDCR. [ECF No. 1, ¶¶ 83, 143].

Mr. Miller is currently incarcerated at Saint Marys Correctional Center and Jail ("SMCC"), serving a one- to ten-year indeterminate sentence for breaking and entering. [ECF No. 1, ¶ 5]. He was sentenced on September 21, 2020. *Id.* ¶ 82. Absent parole, he is projected to be released in April 2025. *Offender Search*, W. Va. Div. of

2

Corrs. & Rehab., https://apps.wv.gov/ois/offendersearch/doc (last name "Miller," first name "Andrew") (last visited Jul. 12, 2023). The Parole Board Panel has interviewed him three times and has thus far declined to grant him parole. [ECF No. 1, ¶¶ 129–33 (indicating Mr. Miller was interviewed in December 2021, July 2022, and October 2022)]. Mr. Miller alleges—and Defendants do not dispute—that his failure to complete RSAT has contributed significantly to the Board's decisions to deny him parole. *Id.*

"Although substance use was not a factor in his offense," Mr. Miller was placed in the RSAT program based on his Level of Service/Case Management Inventory ("LS/CMI") assessment during the inmate classification process. *Id.* ¶ 86. Mr. Miller "is a recovering addict and believes in the disease model of addiction." *Id.* ¶ 85. Prior to his incarceration, he received secular treatment and maintained his sobriety for four years. *Id.* Mr. Miller enrolled in RSAT upon arriving at SMCC in June 2021. *Id.* ¶ 88. Upon enrolling, "it immediately became apparent to Andrew that the program was pervasively religious." *Id.* ¶ 97. These religious elements led Mr. Miller to withdraw from RSAT after approximately five days at SMCC.

As alleged in the Complaint, the RSAT curriculum relies heavily on the "Twelve Steps" developed by Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA"), and on other religious materials. *Id.* ¶¶ 44–81. For example, the RSAT handbook contains inserts that include "the Lord's Prayer, Twelve Promises, Twelve Traditions, the Serenity Prayer, and the Twelve Steps." *Id.* ¶ 44. The Twelve

3

Promises insert states, "We will suddenly realize that God is doing for us what we could not do for ourselves," *id.* ¶ 45, and the Twelve Traditions insert states, "For our group purpose there is but one ultimate authority; a loving God as he may express Himself in our group conscience," *id.* ¶ 46. As for the Twelve Steps insert, Plaintiff's allegations are consistent with the observation made by several courts that "God is named or referred to in five of the 12 steps." *Griffin*, 673 N.E.2d at 102.

RSAT participants "progress through five phases over the course of the program, which lasts at least six months and may last as long as 12." [ECF No. 1, ¶ 49]. To progress through each phase, participants must "demonstrate knowledge" of the Twelve Steps. *Id.* ¶¶ 52–59. They must also attend at least 115 AA/NA meetings, which promote the Twelve Steps and involve daily prayer. *Id.* The AA "Big Book" contains a chapter that "tells atheists and agnostics they are 'doomed to an alcoholic death' unless they 'seek Him.'" *Id.* ¶ 66. "The chapter goes on to deride the nonreligious as 'handicapped by obstinacy, sensitiveness, and unreasoning prejudice.'" *Id.* In addition to requiring attendance at AA/NA meetings, RSAT further promotes the Twelve Steps through "mandatory courses" during which "participants must respond to a number of prompts about 'GOD,' including: 'This is what God means to me,' 'This is what I think God is like,' 'This is how God takes care of me (or could take care of me),' and 'This is a picture that shows how I feel (or would feel) while being taken care of by God.'" *Id.* ¶¶ 62, 64. Plaintiff asserts that he and other RSAT participants "were required to discuss and ruminate on" daily materials that

"were often theistic in nature and almost always expressed a specifically Christian belief." *Id.* ¶¶ 98–99. Reading materials available in the RSAT unit "are almost entirely religious in nature and no religious viewpoints other than Christianity are represented." *Id.* ¶ 100.

Mr. Miller "is an atheist and Secular Humanist and has identified as such since August of 2020." *Id.* ¶ 83. In early July 2021, he "learned that he was classified as 'Christian' in the Offender Information System despite the fact that he never identified himself as Christian to any WVDCR official and he had identified as atheist and Secular Humanist prior to his sentencing." *Id.* ¶ 107. At his request, Mr. Miller's "classification was changed to atheist on July 13, 2021." *Id.* ¶ 108.

On July 12, 2021, Mr. Miller sent a letter to Betsy Jividen, who was WVDCR Commissioner at the time, objecting "to the religious nature of the RSAT program." *Id.* ¶ 109. He requested either that RSAT be removed from his Individual Reentry Program Plan ("IRPP"), or that secular accommodations be provided. *Id.* Specifically, Mr. Miller "suggested that he could receive substance abuse treatment through PSIMED and participate in the Cognitive Behavior Intervention for Substance Abuse (CBISA) and Thinking for a Change classes (courses also provided through the RSAT program) without also being subjected to the religious elements found in other parts of the RSAT Program." *Id.* Mr. Miller explained that he is "willing to complete a substance abuse program as long as it is non-religious in nature." [ECF No. 5-8]. He

"simply do[es] not believe in God, and especially do[es] not believe in depending on an unseen force to cure [his] substance abuse issues." *Id.*

On July 22, 2021, Defendant Medina Prue, RSAT Program Manager for WVDCR, responded to Mr. Miller's letter to then-Commissioner Jividen. [ECF No. 1, ¶¶ 7, 110]. "In her letter, Defendant Prue acknowledged that Andrew was classified as an atheist but nevertheless denied his request for an accommodation." *Id.* ¶ 110. She recognized that "[o]ne of the main reasons a person avoids or dislikes [AA/NA] meetings are due to the emphasis on spirituality," but explained that "it is important to understand the difference between spirituality and religion." [ECF No. 5-9].

Just after writing to then-Commissioner Jividen, Mr. Miller was "suddenly moved" to Parkersburg Correctional Center and Jail ("PBCC") on July 15, 2021. [ECF No. 5-15, at 2]. On July 23, 2021, he filed Grievance No. 21-PBCC-86-0021 ("Grievance I") with his PBCC Unit Manager, Jason Larsen, requesting that RSAT be removed from his IRPP. [ECF No. 1, ¶ 111; ECF No. 5-10]. Mr. Larsen denied his request, stating that RSAT is "designed to give you tools to be able to use upon being released to help you with your addiction" and that he "cannot remove the RSAT off of [Mr. Miller's] Case Management Plan that is done at central office in Charleston." [ECF No. 1, ¶ 111; ECF No. 5-11]. Mr. Miller appealed Mr. Larsen's denial of Grievance I to Aaron Westfall, Superintendent of PBCC, who "concurred with Mr. Larsen's decision." [ECF No. 1, ¶ 113]. Finally, Mr. Miller "appealed Grievance I to the Office of the Commissioner." *Id.* ¶ 116. On August 11, 2021, that appeal was

denied in a letter reiterating Defendant Prue's statement that "it is easy to confuse spirituality with religion and this can be quite polarizing to many people," and adding that "[a]ny consequences from refusing programming will be a result of your personal decisions." [ECF No. 5-14].

Meanwhile, on July 25, 2021, Mr. Miller filed an additional grievance, No. 21-PBCC-86-0023 ("Grievance II"), "requesting the opportunity to sign up for CBISA and Thinking for a Change without participating in the larger RSAT program." [ECF No. 1, ¶ 112]. Once again, Mr. Larsen denied his request, and Mr. Westfall and the Commissioner both concurred in that denial on appeal. *Id.* ¶¶ 114, 117–18. Mr. Larsen explained that "[i]n the RSAT program CIBISA [sic] and Thinking for A Change is [sic] taught." [ECF No. 5-13]. Also in late July 2021, Mr. Miller "spoke directly with Defendant Prue and reiterated his request for an accommodation. She responded that inmates do not get to dictate the classes they take and prevailed upon him to reenter the RSAT program." [ECF No. 1, ¶ 115].

In September 2021, Mr. Miller reenrolled in RSAT and remained enrolled for about two months. *Id.* ¶ 90. While participating in the program, RSAT Elders— inmates who already completed RSAT—"assigned him the job of Education Coordinator" ("EC"). *Id.* ¶¶ 32, 101. "As EC, he was required to present courses to other RSAT Program participants," using materials developed by Texas Christian University ("TCU") and "promoting specifically a Christian worldview and a reliance on the Twelve Steps." *Id.* ¶ 102. "In addition to the TCU-developed courses he was

required to present as EC, he was allowed to develop his own course, Providing Answers for Transitioning Home (PATH) and deliver it to RSAT program participants." *Id.* ¶ 103. During his time in the program, Mr. Miller "attended at least 18 AA or NA meetings." *Id.* ¶ 104. "Each meeting of either AA or NA starts and ends with the Lord's Prayer and the Serenity Prayer, respectively." *Id.* ¶ 76.

In November 2021, Mr. Miller withdrew from the RSAT program at PBCC. *Id.* ¶ 90. In December 2021, he went before the Parole Board Panel and received a "Deferred/Contingent Status, subject to obtaining an approved place of residency and completing RSAT." *Id.* ¶ 130. Mr. Miller then wrote to Defendant Leslie Hill, the WVDCR Director of Classification, "to again request that RSAT be removed as a required part of his IRPP." *Id.* ¶ 119. In his letter, dated March 7, 2022, Mr. Miller outlined his objections to the religious components of RSAT and explained how his prior requests for accommodation were "denied or subverted in some way." [ECF No. 5-15]. For example, he was denied enrollment in the CBISA program unless he took it as part of RSAT. Additionally, he "had just been approved to participate in one-on-one therapy through Psi-Med at [SMCC], when [he] was suddenly moved" to PBCC, where he "was informed that there is no money budgeted for therapy at this institution." *Id.* On March 17, 2022, Defendant Misty Adams, Deputy Director of Programs, responded to Mr. Miller's letter to Defendant Hill. [ECF No. 1, ¶ 120]. Ms. Adams denied his request and provided him with "A Humanist Alternative to AA's

Twelve Steps." *Id.* She also mentioned an alternative workbook and promised to "ensure [his] Unit Manager has a copy of that." [ECF No. 5-16].

Mr. Miller subsequently reenrolled in RSAT in early May 2022, at which point he had progressed to Phase 3 of the program. [ECF No. 1, ¶¶ 90–91]. On May 10, 2022, Mr. Miller was transferred from PBCC to Beckley Correctional Center and Jail ("BCC"). *Id.* ¶ 92. "Andrew initially agreed to continue participating in the RSAT Program at BCC. However, after learning that he would be returned to Phase 1 of the RSAT Program, he declined to continue." *Id.* ¶ 93. Shortly thereafter, Mr. Miller returned to PBCC from June 16 to September 9, 2022. *Id.* ¶ 84. In September 2022, he was transferred to SMCC, where he has remained incarcerated until now. *Id.* ¶ 95. According to Mr. Miller, [t]he content of the RSAT Program in the RSAT Units [he] resided in at SMCC, PBCC, and BCC is substantively identical." *Id.* ¶ 96.

On May 28, 2022, Mr. Miller filed Grievance No. 22-BCC-RSAT-23 ("Grievance III"), "describing his efforts to obtain an accommodation, the lack of any meaningful accommodation, and once again requesting that completion of the RSAT Program be removed from his IRPP. His Unit Manager, Gary Webb, denied Grievance III as duplicative of Grievance I." *Id.* ¶ 121. On August 8, 2022, Mr. Miller filed Grievance No. 22-PBCC-86-0038 ("Grievance IV"), "in which he requested an opportunity to complete the RSAT program without being coerced to engage in religious activity and proposed that this be accomplished by providing access to Humanist reading material and secular substance abuse treatment alternatives to AA and NA, such as LifeRing."

9

*Id.* ¶ 122. In denying his request, his Unit Manager, William Westfall, mentioned "a secular handbook for the Narcotics Anonymous Program" and stated that "[m]ost secular material can possibly be obtained if requested by an inmate." [ECF No. 5-21]. Mr. Miller appealed that denial, first to the Superintendent and then to the Commissioner, both of whom denied his appeals. [ECF No. 1, ¶¶ 125–26]. On October 19, 2022, after he was transferred from PBCC back to SMCC, Mr. Miller filed Grievance No. 22-SMCC-83-1-59 ("Grievance V"), which his Unit Manager denied as duplicative of Grievance IV. *Id.* ¶ 127. "Despite his repeated requests for accommodation, as of the filing of this action, the purported secular handbook has never actually been provided to Andrew and the only action WVDCR has ever taken to address his objections was to provide him with the single-page 'A Humanist Alternative to AA's Twelve Steps.'" *Id.* ¶ 128.

On April 3, 2023, Mr. Miller filed a Complaint asserting four federal causes of action pursuant to 42 U.S.C. § 1983. [ECF No. 1]. Mr. Miller claims violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Count I) and of the Establishment Clause (Count II), Free Exercise Clause (Count III), and Free Speech Clause (Count IV) of the First Amendment to the United States Constitution. *Id.* Plaintiff brings these claims against six named defendants—WVDCR Commissioner William K. Marshall, RSAT Program Manager Medina Prue, Director of Classification Leslie Hill, Deputy Director of Programs Misty Adams, SMCC

Superintendent Russell Maston, and SMCC RSAT Unit Manager Melissa Kimble—as well as several John and Jane Does. *Id.*

The day after commencing this litigation, Mr. Miller filed a Motion for Preliminary Injunction asking for prompt accommodation of his sincerely held beliefs. [ECF No. 5]. In lieu of directly responding to the Motion for Preliminary Injunction, Defendants filed a Motion to Dismiss Or, in the Alternative, Motion for Summary Judgment, in which they also set forth their arguments against the requested injunction. [ECF No. 13; ECF No. 14, at 15–16]. Mr. Miller filed both a reply in support of his own Motion as well as a response in opposition to the defendants'. [ECF Nos. 16, 17]. Defendants filed a reply [ECF No. 18], and Plaintiff moved the court for leave to file a surreply, which he attached to the motion for leave [ECF No. 19]. Plaintiff's Motion for Preliminary Injunction [ECF No. 5] and Defendants' Motion to Dismiss Or, in the Alternative, Motion for Summary Judgment [ECF No. 13] are both ripe for decision.

## II.   Motion to Dismiss or for Summary Judgment

Defendants move to dismiss the Complaint or, in the alternative, for summary judgment on all claims. [ECF No. 13].

### A.  Legal Standards

#### i.  Motion to Dismiss

A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). A

11

pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The statement need not include "detailed factual allegations," but it must be "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive dismissal, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To achieve facial plausibility, the plaintiff must plead facts allowing the court to draw the reasonable inference that the defendant is liable, moving the claim beyond the realm of mere possibility. *Id.* Bare "labels and conclusions" or "formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555.

In resolving a motion to dismiss under Rule 12, the court may not consider "matters outside the pleadings." Fed. R. Civ. P. 12(d). However, the court may consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (internal markings and citations omitted).

### ii. Motion for Summary Judgment

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the "depositions, documents, electronically stored information,

affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). Rather, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

If a motion under Rule 12(b)(6) or 12(c) includes "matters outside the pleadings," the court must either disregard those materials or treat the motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The district court has discretion to decide whether to convert the motion to dismiss into a motion for summary judgment; however, "conversion is not appropriate where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (citing *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985)). If the court does exercise its discretion to convert the motion, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other

appropriate order." Fed. R. Civ. P. 56(d). "Such a request is 'broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)).

In this case, the court declines to treat Defendants' Motion [ECF No. 13] as one for summary judgment. Plaintiff properly filed a Rule 56(d) Declaration, stating that "[t]o fully support his claims, the Plaintiff requires information that is in the Defendants' exclusive control," and describing the specific, discoverable information not presently available to him. [ECF No. 17-1, ¶ 2]. Moreover, the parties have had minimal opportunity to conduct discovery. Accordingly, the court will consider Defendants' Motion under the dismissal standard of Rule 12(b)(6) and, in doing so, will disregard any attachments not integral to the Complaint.

In light of new exhibits introduced by Defendants' Reply Memorandum [ECF No. 18], Plaintiff seeks the court's leave to file an attached surreply, [ECF No. 19]. Plaintiff requests "an opportunity to respond, to the extent that this Court intends to convert the Defendants' motion to one for summary judgment and consider documents outside the pleadings." *Id.* Because the court declines to convert Defendants' Motion, no surreply is needed. Plaintiff's motion for leave [ECF No. 19] is **DENIED**.

14

### B. Discussion

I will now examine the Complaint to determine whether its factual allegations, taken as true, state valid claims for relief.

### i. RLUIPA Claim (Count I)

In Count I, Plaintiff asserts a claim under RLUIPA, which provides, in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The party asserting a RLUIPA claim bears the initial burden of proving that the government's action (a) implicates his religious exercise, and (b) substantially burdens that exercise of religion. *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015). Once the claimant makes that showing, the burden shifts to the government to show that substantially burdening the religious exercise of the "particular claimant" is "the least restrictive means of furthering [a] compelling governmental interest." *Id.* at 362 (quoting 42 U.S.C. § 2000cc-1(a)). Given this legal framework, I find that the factual allegations contained in the Complaint are sufficient to state a claim under RLUIPA.

I first consider whether Plaintiff has alleged government action that implicates his religious exercise. Mr. Miller complains that he "is an atheist and Secular

15

Humanist" whose religious freedom has been compromised by government action. RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Congress mandated that the concept "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [RLUIPA] and the Constitution." *Id.* § 2000cc-3(g). Thus, RLUIPA's protections extend to the exercise of "sincere and meaningful" nontheistic or atheistic beliefs—like Mr. Miller's—that "occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons." *Welsh v. United States*, 398 U.S. 333, 339–40 (1970) (quoting *United States v. Seeger*, 380 U.S. 163, 176 (1965)); *see also United States v. Wainscott*, 496 F.2d 356, 361 (4th Cir. 1974) (holding plaintiff's belief that the taking of human life is "morally unpardonable" evinces a "personal code" that meets the tests set forth in *Seeger* and *Welsh*).

Mr. Miller further alleges that his exercise of those atheistic beliefs is substantially burdened by the defendants' actions. A claimant's religious exercise is substantially burdened where the government's actions require him to "engage in conduct that seriously violates [his] religious beliefs." *Holt*, 574 U.S. at 361 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014)). "A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or following his beliefs and losing some government benefit." *Firewalker-Fields v. Lee*, 58 F.4th 104, 114 (4th Cir. 2023).

16

According to the Complaint, Mr. Miller "is required to complete the RSAT Program in order to be eligible for parole," and the program includes "pervasive religious elements." [ECF No. 1, ¶¶ 86, 106]. As examples of these religious elements, Mr. Miller notes numerous references to "God" within RSAT materials, and he describes several mandatory activities "promoting specifically a Christian worldview." *Id.* ¶¶ 40–57, 62–66. These allegations, taken as true, indicate that "Defendants' actions put the Plaintiff to the impossible choice of either violating his sincerely held beliefs . . . or forfeiting the possibility of parole." *Id.* ¶ 136. Accordingly, the Complaint states a *prima facie* claim under RLUIPA,[1] and Defendants' Motion to Dismiss is **DENIED** as to Count I.

### ii. First Amendment Claims

Mr. Miller asserts three claims, pursuant to 42 U.S.C. § 1983, alleging violations of the First Amendment to the United States Constitution. Under the First Amendment, made applicable to the states through the Fourteenth Amendment, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." U.S. Const. amend. I. In Counts II, III, and IV of his Complaint, Mr. Miller alleges Defendants have violated all three operative clauses of the First Amendment.

---

[1] Once the claimant makes this *prima facie* showing, the burden shifts to the government to show that substantially burdening the claimant's religious exercise is the least restrictive means of furthering a compelling government interest.

### 1. Establishment Clause (Count II)

In Count II, Mr. Miller asserts that "[b]y imposing the pervasively religious elements of the RSAT Program on the Plaintiff as a necessary condition for parole eligibility, the Defendants used the coercive power of the state to force the Plaintiff to engage in the exercise of religion in violation of the Establishment Clause." [ECF No. 1, ¶ 143]. Although Establishment Clause jurisprudence is hardly a paragon of clarity, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a state religion or religious faith, or tends to do so.'" *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)); *accord Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2429 (2022) ("[T]he government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make a religious observance compulsory.'" (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952))). When presented with a coercion-based claim, courts employ a three-part inquiry established by the Seventh Circuit in *Kerr v. Farrey*: "first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular?" 95 F.3d at 479; *see, e.g.*, *Janny*, 8 F.4th at 908 (applying *Kerr* test); *Jackson*, 747 F.3d at 542 (same).[2] All three prongs are easily met by the facts alleged here.

---

[2] See *Ross v. Keelings*, 2 F. Supp. 2d 810, 816–17 (E.D. Va. 1998), for a thorough discussion of why the *Kerr* approach "is a permissible substitute for the traditional *Lemon* test."

First, clearly the state has acted by administering the RSAT program to Mr. Miller and to other individuals in the custody of WVDCR. *See* [ECF No. 1, ¶ 26 ("The WVDCR operates a Residential Substance Abuse Treatment (RSAT) Program with the support of federal funding.")]. In addition to implementing RSAT programming, the state is also "responsible for offender classification." *Id.* ¶ 15. WVDCR "conducts regular assessments of inmates and determines the elements of each inmate's Individual Reentry Program Plan," including whether an inmate must complete RSAT. *Id.* ¶ 18.

Second, this state action plainly amounts to coercion. A government exercises coercive power over an individual when his noncompliance subjects him to "meaningful penalties," including the denial of benefits. *Kerr*, 95 F.3d at 479 (finding coercion where inmate's refusal to attend NA meetings triggered "classification to a higher security risk category and adverse notations in his prison record that could affect his chances for parole"); *see Griffin*, 673 N.E.2d at 105 ("[T]he State, through its correctional authorities . . . , has exercised coercive power to advance religion by denying benefits of eligibility for the Family Reunion Program to atheist and agnostic inmates who object and refuse to participate in religious activity which is an inextricable part of the [Alcohol and Substance Abuse Treatment] Program."). Here, Mr. Miller alleges that he "is required to complete the RSAT Program in order to be eligible for parole," [ECF No. 1, ¶ 86], and that his security classification is adversely affected by non-participation, *id.* ¶¶ 38–39 ("The points assigned to an inmate are

used to determine, among other things, the security level at which an inmate is to be housed. Refusal to participate in required programs, including RSAT, results in two points being assessed against the inmate."). These allegations, taken as true, patently demonstrate government coercion.

As Defendants point out, "parole itself is not a constitutional right." [ECF No. 14, at 13 (citing *Vann v. Angelone*, 73 F.3d 519, 521–22 (4th Cir. 1996))]. As such, "a state has no duty to establish a system of parole, and if it chooses to do so, federal courts should allow a state's parole authorities a wide range for experimentation and the exercise of discretion." *Vann*, 73 F.3d at 521. But once a state establishes a system of parole, an inmate "does have the right to be free from unconstitutional burdens when availing himself of existing ways to access the benefit of early parole." *Jackson*, 747 F.3d at 543 ("The fact that Jackson did not have a constitutional right to, or statutory guarantee of, early parole does not preclude him from stating a claim of unconstitutional coercion."); *accord Lee*, 505 U.S. at 596 ("It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit [his] rights and benefits as the price of resisting conformance to state-sponsored religious practice.").

The third prong of the *Kerr* test requires more discussion, but its application is also quite straightforward. The Complaint is replete with allegations that RSAT relies heavily on twelve-step programming and expressly requires participants to attend dozens of AA/NA meetings. *See id.* ¶¶ 40–76, 97–105. It is well-established that the Twelve Steps "are based on the monotheistic idea of a single God or Supreme

Being, which is rooted in the religious concept of a Higher Power." *Frequently Asked Questions Regarding Twelve-Step Recovery Programs for Recipients of Justice Department Financial Assistance*, U.S. Dep't of Just. (Jan. 1, 2012), https://ojp.gov/about/ocr/pdfs/TwelveStepRecoveryPrograms_FAQs.pdf   [hereinafter *DOJ Twelve-Step FAQ*]. As such, every court "presented with an Establishment Clause challenge implicating A.A. or a comparable therapy program" has found the program to involve "such substantial religious components that governmentally compelled participation in it violate[s] the Establishment Clause." *Cox v. Miller*, 296 F.3d 89, 108 n.11 (2d Cir. 2002); *Inouye*, 504 F.3d at 714 n.9.

These courts have also rejected the argument—now asserted by Defendants— that twelve-step programs are merely "spiritual" rather than religious, and therefore do not offend the First Amendment. *See* discussion *infra*. But even if these were accurate characterizations of the law and the twelve-step elements of RSAT, Mr. Miller's Complaint contains additional allegations sufficient to maintain his claim. Plaintiff alleges that the RSAT Handbook contains the Lord's Prayer, [ECF No. 1, ¶ 44]; that RSAT course materials "frame the topics from a specifically Evangelical Christian worldview," *id.* ¶ 62; that "material[s] on the 'Thoughts of the Day' board were often theistic in nature and almost always expressed a specifically Christian belief," *id.* ¶ 98; that reading materials in the RSAT unit "are almost entirely religious in nature and no religious viewpoints other than Christianity are represented, *id.* ¶ 100; and that "painted phrases" on the walls of the RSAT Unit at PBCC included

21

"LET GO AND LET GOD" and "DO YOUR BEST AND LET GOD DO THE REST,"
*id.* ¶ 105. These allegations, taken as true, illustrate the religious character of the
RSAT program, even without considering its twelve-step components.

Indeed, Defendants' insistence that they have provided Mr. Miller with a
"secular alternative" to RSAT would seem to belie the otherwise non-secular nature
of the program. *See* [ECF No. 18, at 2; ECF No. 18-2, at 2 (distinguishing "non-
religious material" from "traditional 12 step programs of higher power")].
Nevertheless, I address Defendants' argument that "a secular version of the RSAT
program exists and is available to the Plaintiff should he choose to participate." [ECF
No. 18, at 5]; *cf. O'Connor*, 855 F. Supp. at 308 (holding Establishment Clause was
not violated where individuals convicted of drunk driving had a choice over whether
to attend AA or another "viable, although less frequently offered, self-help program
that does not use any concept of 'spirituality' to treat alcohol-related problems").

This argument fails for at least two reasons. First, Mr. Miller's allegations
suggest that Defendants have not provided the accommodations they offered. *See*
[ECF No. 1, ¶ 128 ("Despite his repeated requests for accommodation, as of the filing
of this action, the purported secular handbook has never actually been provided to
Andrew and the only action WVDCR has ever taken to address his objections was to
provide him with the single-page 'A Humanist Alternative to AA's Twelve Steps.'")].
Second, even if Defendants had followed through on their promises to provide Mr.
Miller with secular materials, "such an accommodation would not be sufficient as it

would do nothing to address the numerous religious aspects of the RSAT program that he would still be required to participate in in order to be eligible for parole." *Id.* ¶ 124. Notably, Defendants' proposed accommodations consist solely of alternative materials to work from during RSAT activities; none of these alternatives would relieve Mr. Miller of the obligation to attend religious RSAT programming. *See Janny*, 8 F.4th at 910 ("For purposes of protecting the religious freedom guaranteed by the First Amendment, no distinction is drawn between coerced attendance and coerced participation, or between being forced to listen and being forced to convert." (citing *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947))).

The factual allegations contained in the Complaint, if true, show that the state of West Virginia has coerced Plaintiff into religious exercise. Because the Complaint sufficiently alleges a violation of the Establishment Clause, Defendants' Motion to Dismiss is **DENIED** as to Count II.

### 2. Free Exercise Clause (Count III)

In Count III, Mr. Miller argues that Defendants violated his rights under the Free Exercise Clause "[b]y forcing the Plaintiff to participate in a program expressly hostile to his beliefs and by refusing to accommodate the Plaintiff's exercise of his own sincerely held beliefs." [ECF No. 1, ¶ 150]. Under the First Amendment, "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. In carceral settings, the Free Exercise Clause permits restrictions on a prisoner's right to practice his religion or non-religion, so long as such restrictions are

"reasonably related to a legitimate penological interest." *Firewalker-Fields*, 58 F.4th at 114 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). In contrast to the "traditional strict scrutiny test," the reasonableness standard set forth in *Turner* emphasizes the "substantial deference" owed to prison officials. *Id.* at 114 n.2, 115; *see also Turner*, 482 U.S. at 89 ("Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."). "The burden is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Firewalker-Fields*, 58 F.4th at 115 (quoting *Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015)). When determining the reasonableness of a prison regulation, courts consider four factors: "(1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives." *Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019) (quoting *Turner*, 482 U.S. at 89–91). "*Turner* does not call for placing each factor in one of two columns and tallying a numerical result. The objective is to determine . . . the reasonableness of the defendant's conduct under all of the circumstances reflected in the record." *DeHart v. Horn*, 227 F.3d 47, 59 (3d Cir. 2000).

The same facts that support Plaintiff's RLUIPA and Establishment Clause claims also satisfy the threshold showing that Defendants have encroached on his exercise of sincerely held atheist beliefs.[3] "Because the prison policy impinges on [Mr. Miller]'s free exercise rights, it may be upheld only if it meets the *Turner* standard." *Ali v. Dixon*, 912 F.2d 86, 90 (4th Cir. 1990).

The first *Turner* factor demands a "valid, rational connection" between a challenged prison regulation and the legitimate government interest put forward to justify it. *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586

---

[3] As the Fourth Circuit recently noted, the proper standard for this "threshold showing" is somewhat in flux. *Firewalker-Fields*, 58 F.4th at 114 n.2. Prior to 1990, courts applied a "substantial-burden balancing test" to Free Exercise claims. *Id.* A prisoner met his threshold burden by showing "(1) that he holds a sincere religious belief and (2) that his religious practice has been substantially burdened by the prison policy or practice." *Id.* at 114 (citing *Greenhill*, 944 F.3d at 253). If that threshold showing was made, the court then determined whether the challenged government action was nevertheless justified—either by a compelling government interest or, if in a prison setting, under the *Turner* analysis. *Id.* at 114 n.2.

In 1990, the Supreme Court decided *Employment Division v. Smith*, 494 U.S. 872 (1990), and has since "made clear that neutral laws of general application which only incidentally burden religion are not constitutionally suspect." *Firewalker-Fields*, 58 F.4th at 114 n.2 (citing *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876 (2021)). Thus, the Court "reject[ed] the substantial-burden balancing test" in favor of the "neutral-and-generally applicable" test. *Id.* Under this modern approach, a claimant makes his threshold showing if the challenged action is non-neutral or does not apply generally. If that showing is made, the challenged action is examined under *Turner*, or strict scrutiny, depending on the setting in which the claim is asserted. *Fulton*, 141 S. Ct. at 1881.

The Fourth Circuit, however, "still applies a 'substantial burden' threshold test" before proceeding to the *Turner* analysis. *Firewalker-Fields*, 58 F.4th at 114 n.2; *see, e.g.*, *Greenhill*, 944 F.3d at 253; *Carter v. Fleming*, 879 F.3d 132, 139–40 (4th Cir. 2018). The court acknowledges that its approach "appears to be out-of-date," and that "[a] more accurate application of the Supreme Court precedents in this area would look to whether the prison policy or regulation was 'neutral and generally applicable'" and then, if not, apply *Turner*. *Firewalker-Fields*, 58 F.4th at 114 n.2 (quoting *Fulton*, 141 S. Ct. at 1876). Nevertheless, the Fourth Circuit has not had occasion to modify its approach, and the "substantial burden threshold test" remains good law in this jurisdiction. *Id.*

Despite this wrinkle in the law, analyzing Mr. Miller's Free Exercise claim is relatively simple. As in *Firewalker-Fields*, "the threshold standard will not matter in this case." *Id.* In upholding Mr. Miller's RLUIPA and Establishment Clause claims, I have already determined that the conduct at issue both substantially burdens his religious exercise and is non-neutral. As such, Mr. Miller's allegations satisfy the threshold showing for his Free Exercise claim regardless of which test applies.

(1984)). This factor "places a burden on the prison to put forward the actual interests that support their policies." *Firewalker-Fields*, 58 F.4th at 116. Here, Defendants assert that WVDCR has interests "to both protect the public at large by providing inmates with appropriate rehabilitative programs and an equally strong interest in the inmates themselves receiving these programs to help them successfully reintegrate into society and avoid recidivism." [ECF No. 14, at 9]. According to Defendants, their interest "in ensuring that inmates receive necessary rehabilitation outweighs any minimal exposure to religious references which the Plaintiff may experience while incarcerated." *Id.*

In response, Mr. Miller argues that "Defendants have made no attempt to show a 'valid, rational connection' between the religious elements of the RSAT program and the governmental interest put forward to justify it." [ECF No. 17, at 16]. Plaintiff emphasizes that the government's rationale must pertain to the accommodation actually sought—in this case, that Mr. Miller "be excused from participating in the *religious* elements of the RSAT program, or to be allowed to receive substance abuse treatment through some other means." *Id.* at 16–17 (citing *Ali*, 912 F.2d at 90). In *Ali*, an inmate converted to Islam and adopted a new name, which he requested be included in his prison record as an "a.k.a. addition." 912 F.2d at 87, 89. The prison refused to add the new name to its records, requiring the inmate to use his former, "religiously offensive name" when collecting benefits to which he was entitled. *Id.* at 87, 90. To justify its refusal, the prison pointed to "the 'administrative nightmare'

26

that would result from *substituting* Ali's new name for his old name in official prison records." *Id.* at 88. The Fourth Circuit rejected the proffered justification, finding "the defendants have failed to advance any penological, or other, justification for refusing to *add* Ali's new name to his prison file." *Id.* at 90.

As in *Ali*, the defendants here have failed to put forth a relevant justification for their challenged conduct. The state may have legitimate interests in providing rehabilitative programs for inmates, but those interests relate only to the provision of substance use disorder treatment *in general.* Mr. Miller "is not suggesting that he be removed from *all* substance abuse treatment." [ECF No. 17, at 17]. Defendants do not explain how any of their interests are furthered by the specific program being administered, nor how those interests would be compromised by accommodating Mr. Miller. *Cf.* [ECF No. 16, at 12–13 (noting that a truly secular program may even *enhance* the government's ability to satisfy its purported interest in rehabilitating inmates through substance use disorder treatment)]. Because Defendants have not put forth a legitimate government interest with a "valid, rational connection" to the prison policy at issue, the first *Turner* factor favors Mr. Miller.

*Turner* next directs the courts to consider "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. "A lack of alternatives does not end the reasonableness analysis but is some evidence that the regulations are unreasonable." *Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 357 (4th Cir. 2021) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003)). The

27

pertinent question is not whether inmates have been denied specific accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their First Amendment rights. *Firewalker-Fields*, 58 F.4th at 117 (quoting *Baranowski v. Hart*, 486 F.3d 112, 121 (5th Cir. 2007)); *see, e.g.*, *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 352 (1987) (finding state-provided imams, communal prayer time, pork-free meals, and Ramadan-specific eating times were relevant to showing that regulations keeping prisoners from Friday Prayer were reasonable).

In some cases, however, "certain aspects of the *Turner* framework do not apply," or require modification, because the rights asserted "are not amenable to alternative modes of expression." *Burns v. Martuscello*, 890 F.3d 77, 87 (2d Cir. 2018). Mr. Miller argues that this is true of coercion-based claims, because "[o]nce the government has coerced someone into participating in religious activities . . . [i]t is of no moment that there are also times when the person is not being so coerced." [ECF No. 17, at 18]. Unlike in the typical case where a prison policy prevents inmates from exercising their religious beliefs in some ways but not others, Mr. Miller challenges a policy that forces him to affirmatively "engage in conduct that seriously violates" his beliefs. *Holt*, 574 U.S. at 361 (quoting *Burwell*, 573 U.S. at 720). Though the distinction between prohibition and coercion can sometimes become blurred, *compare Kuperman v. Wrenn*, 645 F.3d 69, 75 (1st Cir. 2011) (framing issue as prison forbidding inmate from "growing a full beard"), *with Benjamin v. Coughlin*, 905 F.2d 571, 573 (2d Cir. 1990) (framing issue as prison requiring inmates "submit to a

haircut"), I agree with Mr. Miller that "questions about alternative means of expressing the right are ill-fitting" in this case, *Burns*, 890 F.3d at 87. His claims of coerced religious exercise, including several instances of compelled speech, assert rights akin to those against self-incrimination or involuntary medical treatment, which courts have found unamenable to alternative means of exercise. *See, e.g.*, *id.* ("There is no middle ground between silence and speech."); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 135–36 (N.D.N.Y. 2004) (finding right against self-incrimination cannot be exercised at all while any infringement upon the right occurs (discussing *McKune v. Lile*, 536 U.S. 24 (2002) and *Ainsworth v. Stanley*, 317 F.3d 1 (1st Cir. 2002))); *Russell v. Richards*, 384 F.3d 444, 448 n.2 (7th Cir. 2004) ("*Harper* deems the second *Turner* factor—whether any alternative means of exercising the right in question remain open to the inmate—irrelevant in the context of involuntary medical treatment, for the obvious reason that the involuntary nature of the treatment deprives the inmate of any choice." (citing *Washington v. Harper*, 494 U.S. 210, 224–25 (1990) (finding three of four *Turner* factors relevant))). Under the traditional approach, "alternative means of exercising" his beliefs "remain open" to Mr. Miller in the sense that he is free to engage in atheist practices during several hours of his day which are not dedicated to RSAT programming. *See* [ECF No. 1, ¶¶ 67–81 (indicating that participants' daily schedule includes about four hours of RSAT coursework and two hours of recreational time)]. But properly viewing the right at issue as one against involuntary religious exercise, the only "alternative means" available to Mr.

Miller is to jeopardize his eligibility for parole. In other words, Mr. Miller's sole "alternative"—simply resisting substantial government coercion and suffering the inherent consequences thereof—is no true alternative at all. *See generally Wall v. Wade*, 741 F.3d 492, 501 (4th Cir. 2014) (declining to broadly define right as "all forms of religious exercise" and finding inmate lacked alternative means of observing Ramadan where only choices were to comply with coercive policy or face disciplinary action). Thus, to the extent the second *Turner* factor applies, I find it favors Plaintiff's claim that Defendants' policy is unreasonable.

The third *Turner* factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Mr. Miller essentially proposes three possible avenues for accommodating his beliefs: (1) that he participate in the secular portions of RSAT, such as the CBISA and Thinking for a Change classes, but be excused from the program's religious elements, [ECF No. 1, ¶ 109]; (2) that he participate in alternative, secular programming, including "access to Humanist reading material and secular substance abuse treatment alternatives to AA and NA, such as LifeRing," *id.* ¶ 122; or (3) that RSAT be removed from his IRPP altogether, *id.* ¶ 121. The first option solely involves programming already administered through RSAT. With respect to secular alternatives, Mr. Miller notes that "[n]umerous SMART Recovery and LifeRing meetings take place every day of the week and provide an option for virtual attendance." [ECF No. 17, at 18]. Furthermore, if

30

providing equipment for his virtual attendance would unduly burden Defendants, "Andrew could organize his own such meeting in the RSAT unit," just as he has previously done, with the encouragement of RSAT, in his role as Education Coordinator. *Id.*; *see* [ECF No. 1, ¶ 103]. Accepted as the truth, Mr. Miller's allegations indicate that accommodations are readily available and minimally burdensome. *See also* [ECF No. 17, at 19 ("These accommodations utilize mechanisms already in place within the RSAT unit.")]. Certainly, some accommodations would likely require additional resources, such as the costs of acquiring secular materials, as well as meeting space and security for alternative programming. But nowhere in their briefing or other filings do Defendants address any of these practical considerations. The court therefore finds the third *Turner* factor to favor Plaintiff.

Finally, *Turner* directs courts to consider the availability of alternative means of achieving the penological interests advanced by prison authorities. 482 U.S. at 90. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," while "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* In *Turner*, the Supreme Court clarified that "[t]his is not a 'least restrictive alternative' test . . . [b]ut if an inmate claimant can point to an alternative that fully accommodates the prisoner's right at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 90–91. Although Mr. Miller "bears a not

31

insignificant burden to bring forward easy alternatives to the policy that burdens [his] religious practice," *Firewalker-Fields*, 58 F.4th at 118, that burden has been met here. As just explained, an alternative policy permitting accommodation would "utilize already-extant mechanisms within the RSAT program." [ECF No. 17, at 19]. Mr. Miller also identifies several secular programs that are available virtually or could, like RSAT, be administered by inmates. *E.g.*, [ECF No. 1, ¶ 122 (suggesting LifeRing as an alternative to AA and NA)]. Instead of providing accommodations, another alternative would involve modifying the main RSAT program to eliminate its religious elements. As Mr. Miller notes, RSAT already includes many secular components that could remain in place. Furthermore, secular treatment programs in other states, as well as the funding of such programs by the United States Department of Justice ("DOJ"), demonstrate the existence and feasibility of alternatives. *See, e.g.*, *DOJ Twelve-Step FAQ*, *supra* (explaining that RSAT grants cannot fund twelve-step programs and suggesting secular alternatives such as SMART Recovery, Rational Recovery, Secular Organizations for Sobriety/Save Our Selves, and LifeRing). *Compare Ross*, 2 F. Supp. 2d 810 (holding Virginia's Therapeutic Community Program violated the Establishment Clause), *and Nusbaum v. Terrangi*, 210 F. Supp. 2d 784 (W.D. Va. 2002) (holding Virginia's post-*Ross* modifications were insufficient and "the Therapeutic Community Program continues to violate the Establishment Clause"), *with Gray v. Johnson*, 436 F. Supp. 2d 795 (W.D. Va. 2006) (upholding Therapeutic Community Program upon finding

"defendants have taken steps to remove religious aspects from the TC Program in light of the *Nusbaum* decision"). Clearly, there is no "absence of ready alternatives" to the RSAT policy at issue in this case. Thus, the fourth *Turner* factor favors Plaintiff.

In sum, the *Turner* factors all suggest that WVDCR's policy is unreasonable. *Turner*, 482 U.S. at 89. Accordingly, the allegations contained in Mr. Miller's Complaint are sufficient to state a claim under the Free Exercise Clause. Defendants' Motion to Dismiss is **DENIED** as to Count III.

### 3. Free Speech Clause (Count IV)

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. In Count IV of his Complaint, Mr. Miller asserts that Defendants violated his rights under the Free Speech Clause when they "put [him] to the choice of delivering the government's preferred message or forfeit his eligibility for parole." [ECF No. 1, ¶ 157]. Mr. Miller alleges that to advance through RSAT, he was required to "demonstrate knowledge" of the Twelve Steps, answer questions about "God," and recite the "Unit Prayer." *Id.* ¶¶ 52–57. Mr. Miller was also assigned the role of Education Coordinator, in which "he was required to present courses to other RSAT Program participants." *Id.* ¶¶ 101–02. For the courses he was assigned to instruct, the materials provided were "all developed by TCU and promot[e] specifically a Christian worldview and a reliance on the Twelve Steps." *Id.* In response, Defendants argue that "distributing course materials is not akin to a restriction on the Plaintiff's

33

speech or an endorsement of those materials by the Plaintiff." [ECF No. 14, at 13]. Noting that the First Amendment protects speech by "ensuring its full expression," *id.* (quoting *Lee*, 505 U.S. at 591), Defendants contend that Plaintiff's Free Speech claim is "misplaced" because "[n]othing in the Complaint alleges that the Plaintiff has been restricted from participating in the expression of his beliefs," [ECF No. 14, at 12].

Defendants are correct that Plaintiff has not alleged that he has been prevented from expressing his own secular beliefs. But it is well established that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943)). "[A] state measure which forces an individual, as part of his daily life . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable . . . 'invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.'" *Id.* at 715 (quoting *Barnette*, 319 U.S. at 642). To determine whether a governmentally compelled activity "possesses sufficient communicative elements to bring the First Amendment into play," courts ask whether "an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Stuart v. Camnitz*, 774 F.3d 238, 245 (4th Cir. 2014) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)) (internal markings omitted).

There can be no doubt that the First Amendment is implicated here. Mr. Miller alleges that "he was required to present courses to other RSAT Program participants" using materials "promoting specifically a Christian worldview." [ECF No. 1, ¶ 102]. Even accepting Defendants' attempt to reduce Mr. Miller's allegations to simply "distributing course materials," [ECF No. 14, at 13], an "intent to convey a particularized message" is manifest; the very purpose of RSAT, in Defendants' own words, is to "promote moral rehabilitation" through "belief in a power higher than yourself," *id.* at 2. That Mr. Miller was required to "demonstrate knowledge" of course content not only represents another instance of compelled speech but also indicates the substantial likelihood that RSAT content would be understood by those to whom it is delivered. Taking these allegations as true, WVDCR's practices involve "quintessential compelled speech" because inmates must "say things they otherwise would not say." *Stuart*, 774 F.4th at 246. Having found an impingement on Mr. Miller's First Amendment rights, I must now consider the *Turner* factors and determine whether that impingement is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

For the same reasons supporting Mr. Miller's Free Exercise claim, his Free Speech claim survives dismissal. As in the Free Exercise analysis, Defendants have not articulated legitimate interests in requiring Mr. Miller and other RSAT participants to deliver and demonstrate knowledge of religious course materials. Once again, Defendants rely on only a general interest in rehabilitating inmates,

35

[ECF No. 14, at 17], which fails to address Plaintiff's specific objections and proposed accommodations. Mr. Miller has met his "not insignificant burden" of showing the availability of reasonable accommodations and alternative policies. *Firewalker-Fields*, 58 F.4th at 118. Accordingly, Plaintiff has adequately pleaded an unreasonable impingement upon his free speech rights. Defendants' Motion to Dismiss is **DENIED** as to Count IV.

Because Mr. Miller's Complaint states viable claims for relief in all four counts, Defendants' Motion to Dismiss [ECF No. 13] is **DENIED** in its entirety.

## III.   Motion for Preliminary Injunction

Having found that Mr. Miller's Complaint states valid claims for relief, I now turn to his Motion for a Preliminary Injunction. [ECF No. 5]. In connection with this Motion, Mr. Miller also filed a Motion for Argument, asking the court to set oral argument on his request for an injunction. [ECF No. 26]. Because the issues have been fully briefed, and oral argument would not aid the court's decision-making, the Motion for Argument [ECF No. 26] is **DENIED**. Based on the parties' thorough filings, I now address the propriety of a preliminary injunction.

### A.  Legal Standard

Upon notice to the adverse party, a district court may issue a preliminary injunction. Fed. R. Civ. P. 65(a)(1). Unlike on a motion to dismiss, the court may consider evidence outside the pleadings to determine whether to issue the injunction. Fed. R. Civ. P. 65(a)(2) (discussing "evidence that is received on the motion").

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four requirements must be satisfied. *Id.* Plaintiff "need not establish a 'certainty of success,'" but he must "make a clear showing that [he is] likely to succeed at trial." *Roe*, 947 F.3d at 219 (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)). "Similarly, a plaintiff must demonstrate more than just a 'possibility' of irreparable harm." *Di Biase*, 872 F.3d at 230.

"The principal function of a preliminary injunction is to maintain the status quo," *id.* at 231, and "to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits," *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). But where an applicant's right to relief is "indisputably clear," the court may issue a "mandatory preliminary injunction" which "alter[s] rather than preserve[s] the status quo." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes*

37

*Powell*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235 (1972)). Because "[m]andatory preliminary injunctions do not preserve the status quo," they "normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *In re Microsoft*, 333 F.3d at 526 (quoting *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)). "That is to say, a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *Id.*

### B. Discussion

#### i. Likelihood of Success on the Merits

I will first determine whether Mr. Miller has demonstrated a clear likelihood of success on the merits of any of his four claims. Because the facts of this case are largely undisputed, with all extrinsic evidence corroborating Plaintiff's allegations, the same reasons that weigh against dismissal also weigh in favor of granting the requested injunction. Under this prong of the preliminary injunction analysis, I will avoid merely reiterating the points discussed above, instead focusing on more nuanced arguments that were immaterial under the lower standard of Rule 12(b)(6).

#### 1. RLUIPA (Count I)

The party asserting a RLUIPA claim bears the initial burden of proving that the government's action (a) implicates his religious exercise, and (b) substantially

burdens that exercise of religion. *Holt*, 574 U.S. at 360–61. Once the claimant makes that showing, the burden shifts to the government to show that substantially burdening the religious exercise of the "particular claimant" is "the least restrictive means of furthering [a] compelling governmental interest." *Id.* at 362 (quoting 42 U.S.C. § 2000cc-1(a)).

### a. Religious Exercise

Mr. Miller "is an atheist and Secular Humanist and has identified as such since August of 2020, . . . prior to his sentencing." [ECF No. 1, ¶¶ 83, 107]. Mr. Miller "does not believe in any deity or higher power, nor does he believe that the Universe, science, or any other abstract concepts have agency or willpower to which he could conceivably submit." *Id.* ¶ 83. He "believes in helping others because it is the right thing to do." *Id.* ¶ 84. As discussed above, Mr. Miller's sincerely held atheist beliefs are entitled to protection under RLUIPA.

Defendants are skeptical that Mr. Miller's beliefs are the true reason for his refusal to complete RSAT. They note that Mr. Miller has "expressed dissatisfaction with the program and doubts its effectiveness." [ECF No. 14, at 2 (citing ECF No. 13-9) ("Also, I doubt the value of the program, and the facility is a dump. The groups/meetings are a joke, I highly doubt they are helping anyone stay sober.")]. Based on this commentary, Defendants conclude "Plaintiff's own words indicate that he does not want to participate in RSAT for reasons having nothing to do with his allegations involving religion." *Id.* at 14; *cf. id.* at 14–15 ("He can choose not to

participate in RSAT if he believes it is not effective, but he also cannot enjoy the benefits of whatever positive consideration the Parole Board may give RSAT completion by virtue of this choice."). *But see* [ECF No. 18, at 2 ("The Plaintiff, by his own admission, voluntarily chose not to participate in the RSAT program *because* he argues there to be a religious aspect to the program." (emphasis added))]. Defendants do not, however, go so far as to challenge the sincerity of Mr. Miller's atheistic beliefs. *See* [ECF No. 14, at 7 ("The Defendants, for the purpose of the present motion, do not dispute that the Plaintiff is sincere in his continuing assertion that he is an atheist.")]. Nor do they explicitly claim that Mr. Miller's invocation of those beliefs is merely pretextual. At most, Defendants contend that Mr. Miller may have multiple reasons for not wanting to participate in RSAT, some of which "hav[e] nothing to do with" religion and are not otherwise protected by federal law. [ECF No. 14, at 14]. But if Mr. Miller can show that his rights under RLUIPA have been violated, any additional misgivings he may have about RSAT are irrelevant. Furthermore, Mr. Miller has repeatedly stated his willingness to participate in the program's secular components. He commented on the effectiveness of RSAT only after he had already made numerous complaints about the program's religious elements, suggesting the latter is his primary concern. *Compare, e.g.*, [ECF No. 5-8 (letter dated July 12, 2021, objecting to RSAT's religious content)], *and* [ECF No. 5-10 (grievance dated July 23, 2021, objecting to RSAT's religious content)], *with* [ECF No. 13-9, at 5 (RSAT refusal

form dated May 28, 2022, objecting to both religious content and overall value of the program)].

### b. Substantial Burden

A claimant's religious exercise is substantially burdened where the government's actions required him to "engage in conduct that seriously violates [his] religious beliefs." *Holt*, 574 U.S. at 361 (quoting *Burwell*, 573 U.S. at 720). "A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or following his beliefs and losing some government benefit." *Firewalker-Fields*, 58 F.4th at 114.

Mr. Miller argues that certain requirements of the RSAT program "are directly in conflict with [his] exercise of his atheism and Secular Humanism." [ECF No. 6, at 12]. He asserts that RSAT requires him to "falsely profess belief in a deity, repeatedly participate in religious activities he opposes, and engage in a course of treatment at odds with his sincere beliefs." *Id.* "To ask an atheist or Secular Humanist to declare something to be their deity or 'higher power' is no less burdensome than asking a Christian to profess a belief in the [A]scension of the Prophet Muhammad into Heaven." *Id.* at 14.

Defendants acknowledge—and the record confirms—that Mr. Miller is required to complete RSAT to become eligible for parole. *See* [ECF No. 14, at 13 ("The State of West Virginia, using its 'considerable degree of discretion,' has determined that the Plaintiff should complete the RSAT program prior to being released on

parole." (quoting *Vann*, 73 F.3d at 521))]; *see also* [ECF No. 5-2 (stating that Mr. Miller's December 2021 parole interview resulted in "a Deferred/Contingent Status, subject to obtaining an approved place of residency and completing RSAT"); ECF No. 5-3 (listing factors contributing to July 2022 decision to deny Mr. Miller parole, including his "unsuccessful participation in risk reducing programs," "need to complete required DOC programs," and "[l]ack of willingness to comply with prior Board recommendations [to complete RSAT]"); ECF No. 5-8 (explaining that "the very first time [he] met with the R.S.A.T. staff, and on many subsequent occasions," he "was told" that "if [he] did not complete the program [he] would not be granted parole, and would be made to discharge [his] sentence")]; *cf.* [ECF No. 5-4 (listing factors contributing to October 2022 denial of parole, including "recent misconducts" as well as "unsuccessful participation in risk reducing programs")]. Defendants argue, however, that this requirement does not substantially burden Mr. Miller's religious exercise because RSAT "is not religious in nature" and "because there is a secular option for completing the RSAT program." [ECF No. 14, at 7, 13].

I first address Defendants' argument that RSAT "is not religious in nature." *Id.* Defendants do not dispute Mr. Miller's allegations as to the contents of the RSAT program, but they insist the program is merely spiritual rather than religious. *See, e.g.*, [ECF No. 5-9 (acknowledging that required RSAT meetings place an "emphasis on spirituality" and "belief in a power higher than yourself" but explaining that "it is important to understand the difference between spirituality and religion"); ECF No.

5-14 (same); ECF No. 5-16 ("AA/NA simply requires the individual to come to believe in a power higher than themselves . . . . GOD in this sense is not a religious connotation but an example of a higher power.")]. According to Defendants, RSAT "merely requires an acknowledgment that addiction 'is more powerful than you and therefore something outside yourself must be capable of contributing to your recovery.'" [ECF No. 14, at 8 (quoting ECF No. 13-2)]; *see id.* at 11 ("Any reasonable person would acknowledge this point of view; the mere fact that one recognizes that they are subject to the laws of the State of West Virginia and the United States of America is essentially an acknowledgement that one is subject to an authority greater than the self."). The program "makes clear that this does not have to be a religious deity." *Id.* at 11. Defendants insist that "belief in a power greater than oneself, however one chooses to construe that term, is part of a system of recovery," *id.* at 8, and they suggest that atheists like Mr. Miller could "replace the word [God] with whatever [they] feel [their] higher power to be even if it is nature, the laws of science, humanity," [ECF No. 5-16]. In stressing that RSAT "does not promote specific religious beliefs," Defendants point to the RSAT Handbook's explicit directive that participants "[m]ust be open to other beliefs which may differ from their own." [ECF No. 14, at 3 (citing ECF No. 13-8, at 27)].

But by attempting to draw a distinction between spirituality and religion, Defendants effectively concede that RSAT imposes specific spiritual beliefs on its participants. Promoting such beliefs in a coercive environment substantially burdens

the religious exercise of atheists like Mr. Miller, who "does not believe in any deity or higher power, nor does he believe that the Universe, science, or any other abstract concepts have agency or willpower to which he could conceivably submit," [ECF No. 1, ¶ 83], and "do[es] not believe in depending on an unseen force to cure [his] substance abuse issues," [ECF No. 5-8].

Numerous courts have examined nearly identical programs and expressly rejected the arguments now advanced by Defendants. *DOJ Twelve-Step FAQ, supra* ("Courts have repeatedly found that traditional twelve-step programs contain religious content and are religious activities."). For example, in *Kerr*, the Seventh Circuit considered whether a prison's NA program "escaped the 'religious' label because the twelve steps used phrases like 'God, as we understood Him,' and because the warden indicated that the concept of God could include the non-religious idea of willpower within the individual." 95 F.3d at 479–80. The court rejected these contentions, finding "[a] straightforward reading of the twelve steps shows clearly that the steps are based on the monotheistic idea of a single God or Supreme Being. . . . Even if we expanded the steps to include polytheistic ideals, or animistic philosophies, they are still fundamentally based on a religious concept of a Higher Power." *Id.* at 480. Similarly, New York's high court was unpersuaded by the state prison's attempt to "eschew any intent to impose a particular sectarian set of beliefs or a particular concept of God upon participants." *Griffin*, 673 N.E.2d at 102. The court conducted a meticulous review of the AA doctrinal texts and concluded:

> [A] fair reading of the fundamental A.A. doctrinal writings
> discloses that their dominant theme is unequivocally
> religious . . . . Indeed, the A.A. basic literature most
> reasonably would be characterized as reflecting the
> traditional elements common to most theistic religions. . . .
> While A.A. literature declares an openness and tolerance
> for each participant's personal vision of God . . . , the
> writings demonstrably express an aspiration that each
> member of the movement will ultimately commit to a belief
> in the existence of a Supreme Being of independent higher
> reality than humankind. . . . [E]ven if respondents are
> correct that A.A. permits a secular interpretation of its
> doctrines and practices, undeniably its paramount theme,
> as we have demonstrated, favors a religious interpretation.

*Id.* at 102, 106.

In this case, it is undisputed that RSAT participants must attend AA/NA meetings as part of their "Mandatory Phase-Up Requirements." [ECF No. 18-3, at 4–7]. Defendants offer no evidence that these meetings differ in any way from the usual AA/NA program, which multiple courts have described as "comprising 'intensely religious events.'" *Inouye*, 504 F.3d at 713 (quoting *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir. 1996)). Indeed, all the evidence in the record corroborates the overtly spiritual nature of AA/NA, as well as WVDCR's embracement and reinforcement of the twelve-step approach. *See, e.g.*, [ECF No. 5-5 (examples of RSAT course materials focusing on the "decision to turn our will and our lives over to the care of God"); ECF No. 13-8, at 27 (directing members of the RSAT "Motivation Crew" to "[t]each new and current family members the meaning of spirituality and its relevance to recovery" and "[t]each new family members the Serenity Prayer and how it is used daily")]. Regardless of the efficacy of AA/NA, it is

established beyond question that "attendance in their programs may not be coerced by the state." *Inouye*, 504 F.3d at 714–16 ("By 2001, two circuit courts, at least three district courts, and two state supreme courts had all considered whether prisoners or parolees could be forced to attend [AA/NA] programs. Their unanimous conclusion was that such coercion was unconstitutional.").

I next address Defendants' argument that no RLUIPA violation has occurred "because there is a secular option for completing the RSAT program." [ECF No. 14, at 13]. As discussed above, this argument fails both because secular accommodations were never implemented, and, moreover, because the proposed accommodations would not alleviate the program's legal shortcomings. *Cf.* [ECF No. 16, at 11 ("An admonition to simply think about kosher or halal foods while eating a meal that violates one's beliefs would be no accommodation for a religious individual. Providing [Mr. Miller] with secular material to think about while he is forced to attend and participate in religious activities, demonstrate proficiency with religious precepts, and deliver instructional material on religious concepts to other inmates, is equally laughable as an attempted accommodation.")]. The record only bolsters these conclusions. For example, Defendants offer evidence of recent modifications to the program that purportedly "demonstrate that the WVDCR was already taking action to ensure that a secular version of the RSAT program was available to inmates." [ECF No. 18, at 3]. In March 2022, Defendants Adams and Prue each sent emails directing WVDCR personnel "to ensure that the 'Serenity Prayer' was not being included as

46

part of the program requirements and that any inmate who did not wish to participate in RSAT because of the 'religious aspect' of AA/NA were given the alternative workbook and twelve steps that do not refer to God." *Id.* (citing [ECF Nos. 18-1, 18-2]). This evidence only reinforces the inadequacy of Defendants' attempts to cure their unconstitutional conduct. Simply providing alternative materials and exempting participants from actively engaging in prayer, while still requiring them to attend the same religious programming, does nothing to lessen the substantial burden on their religious exercise. *See Janny*, 8 F.4th at 910 ("[N]o distinction is drawn between coerced attendance and coerced participation, or between being forced to listen and being forced to convert."); *Warner*, 11 F.3d at 1076 ("The fact that [the probationer] managed to avoid indoctrination despite the pressure he faced does not make the County's program any less coercive, nor nullify the County's liability."); *Jackson*, 747 F.3d at 543 (holding state action "may still amount to coercion" even if inmate was allowed "to sit quietly during the prayers and other religious components").

In sum, the evidence before the court wholly supports Mr. Miller's allegations that the defendants have substantially burdened his protected religious exercise.

### c. Least Restrictive Means of Furthering a Compelling Governmental Interest

Because Mr. Miller will likely succeed in making out a *prima facie* RLUIPA claim, the burden now shifts to WVDCR to show that curtailing his rights is the "least restrictive means of furthering a compelling governmental interest." *Holt*, 574 U.S.

47

at 356 (quoting 42 U.S.C. § 2000bb-1(b)(2)). Defendants argue that even if the RSAT program places a substantial burden on Plaintiff's religious exercise, "WVDCR's compelling interest in ensuring that inmates receive necessary rehabilitation outweighs any minimal exposure to religious references which the Plaintiff may experience while incarcerated. The WVDCR has a compelling interest to both protect the public at large by providing inmates with appropriate rehabilitative programs and an equally strong interest in the inmates themselves receiving these programs to help them successfully reintegrate into society and avoid recidivism." [ECF No. 14, at 9]. Defendants emphasize that "[c]ontext matters" under the "compelling interest" standard, which courts are to apply "with due deference to prison administrators' experience and expertise." [ECF No. 18, at 5 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005))]. Defendants argue that promotion of RSAT programs by the DOJ confirms the importance of such programs. *Id.*

But the rehabilitative interests proffered by Defendants, however compelling, at most legitimize "RSAT programs in general." *Id.* "RLUIPA . . . requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 362–63 (quoting *Burwell*, 573 U.S. at 726) (internal markings omitted). Defendants fail to identify any interests served by requiring Mr. Miller to complete the particular program at issue, which they also fail to show is the "least restrictive means" of

rehabilitating inmates. Indeed, Defendants' reliance on DOJ activity undermines their own position. When DOJ funds RSAT programs, recipients must "ensure that DOJ financial assistance is not used for . . . activities that support twelve-step programs." *DOJ Twelve-Step FAQ, supra*. Recipients may still offer twelve-step programming funded by other sources, but these programs must "take place at a separate time or location from the activities supported with DOJ financial assistance," and recipients must ensure that participation in such programs is "strictly voluntary." *Id.* at 3. While "it is incumbent on the DOJ, rather than this Court, to enforce its funding requirements . . . , the existence of these restrictions is a strong indicator that there is no government interest in requiring incarcerated individuals to participate in religious Twelve Step programs." [ECF No. 17, at 10].

Having found that the state's objective does not justify the challenged program, I conclude that Plaintiff is likely to succeed on the merits of his RLUIPA claim.

## 2. First Amendment Claims Under Section 1983

### a. Establishment Clause (Count II)

Succeeding on his Establishment Clause claim would require Mr. Miller to show (1) that the state acted, (2) the action amounts to coercion, and (3) the object of the coercion is religious rather than secular. *Kerr*, 95 F.3d at 479. As discussed above, all three parts of the *Kerr* test are met here. There is no dispute that the state of West Virginia has acted coercively by requiring Mr. Miller to complete the RSAT program before he may become eligible for parole. There is also no real dispute as to the

contents of the program. *See* [ECF No. 14, at 10]. The parties merely disagree as to the legal conclusion warranted by the undisputed facts.

According to the defendants, the RSAT program "does not advance a religious ideology and does not substantially burden the Plaintiff's atheistic beliefs." *Id.* at 8. But contrary to this assertion, the record reveals the undeniably religious nature of the program. *See, e.g.*, [ECF No. 5-5 (directing RSAT participants to describe "what God means to me" and "how God takes care of me (or could take care of me)"); ECF No. 5-9 (explaining that RSAT includes an "emphasis on spirituality" and "is concerned with belief in a power higher than yourself"); ECF No. 13-8, at 27 (directing that "new family members" be taught "the Serenity Prayer and how it is used daily")]. At a minimum, RSAT participants cannot complete the program—and become eligible for parole—without attending numerous AA/NA meetings. [ECF No. 18-3, at 5–8 (providing that advancement through all five phases of RSAT requires participants to attend at least 115 AA/NA meetings)]. Courts have unanimously found that the AA/NA program "has such substantial religious components that governmentally compelled participation in it violate[s] the Establishment Clause." *Inouye*, 504 F.3d at 714 n.9; *see, e.g.*, *Warner*, 115 F.3d at 1076 ("The County argues further that the non-sectarian nature of the A.A. experience immunizes its use of religious symbolism and practices from Establishment Clause scrutiny. The argument is at the very least factually misleading, for the evidence showed that every meeting [the probationer] attended included at least one explicitly Christian prayer.

Furthermore, the claim that non-sectarian religious exercise falls outside the First Amendment's scrutiny has been repeatedly rejected by the Supreme Court."); *O'Connor*, 855 F. Supp. at 307–08 ("Spirituality is a central part of the Alcoholics Anonymous philosophy, and the program contains religious overtones. While AA is not a 'religion'—various faiths may all participate without renouncing their religious convictions—a review of the 'Big Book of Alcoholics Anonymous' reveals that it is founded on monotheistic principles. While it is true that reference to 'God' and 'Higher Power' need not mean a deity, the association between the two is frequently made. Establishment Clause doctrine requires not simply the absence of favoritism among religions but of religion over non-religion as well."); *Nusbaum*, 210 F. Supp. 2d at 788 ("[Defendant] has instituted a mandatory program which implicitly espouses religion. . . . The Program teaches spirituality and encourages participants to turn their lives over to their 'higher power.' While spirituality and 'higher power' are defined in 'The Alternative 12 Steps: A Secular Guide to Recovery,' in a secular manner, the overall program blurs this distinction.").

Accordingly, I find that Mr. Miller will likely succeed on the merits of his Establishment Clause claim.

### b.  Free Exercise Clause (Count III)

To succeed on his Free Exercise claim, Mr. Miller must show a substantial burden on his religious exercise that is not reasonably related to legitimate penological interests. As discussed above, Mr. Miller easily meets the first part of this

burden—his religious exercise is substantially burdened because his eligibility for parole has been conditioned upon his completion of religious programming. Thus, the RSAT program is constitutional only if it is reasonable under the *Turner* factors.

As also discussed above, the *Turner* factors suggest the program is unreasonable. West Virginia's general interest in rehabilitating inmates bears no "valid, rational connection" to the religious nature of its treatment program. WVDCR's policy leaves Mr. Miller with no means of exercising his right against involuntary religious activity or his right to be free from unconstitutional burdens when seeking parole through existing channels. Mr. Miller has proposed several accommodations and alternatives that are readily available and impose minimal hardship on prison resources. Defendants make no attempt to refute the existence and feasibility of these options. All these undisputed circumstances indicate the unreasonableness of WVDCR's RSAT policy.

Because Mr. Miller has shown an unreasonable encroachment on his First Amendment rights, I find him likely to succeed on the merits of his Free Exercise claim.

### c.  Free Speech Clause (Count IV)

Like in the Free Exercise context, Mr. Miller's Free Speech claim requires him to show that Defendants' policy impinges on his rights to freedom of speech without a reasonable relation to legitimate penological interests. As discussed above, Plaintiff easily meets his threshold burden of showing an impingement on his rights.

52

Defendants do not dispute that Mr. Miller was required to present and recite RSAT course material, and I have already determined that these activities comprise "quintessential compelled speech" that "bring[s] the First Amendment into play." *Stuart*, 774 F.3d at 245–46 ("Moreover, the statement compelled here is ideological; it conveys a particular opinion."). As also discussed above, Mr. Miller can further demonstrate that such compelled speech lacks any reasonable relation to legitimate penological interests. Although they do not bear the burden of proof, Defendants offer no evidence relevant to any *Turner* factor that would suggest the validity of their policy. Accordingly, Mr. Miller has shown a clear likelihood of success on the merits of his Free Speech claim.

### ii. Irreparable Harm

Having determined that Mr. Miller is likely to succeed on the merits of all four claims, I turn to the next step of the preliminary injunction analysis and inquire whether he is likely to suffer irreparable harm in the absence of preliminary relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)). Thus, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

Absent a preliminary injunction or final adjudication of this case, Mr. Miller either must complete the RSAT program or forgo even the possibility of parole. In other words, Defendants' unmitigated actions force Mr. Miller to choose between two distinct but equally irreparable injuries: submit to government coercion and engage in religious exercise at odds with his own beliefs, or abandon any attempt to access a government benefit for which he may otherwise be eligible and remain incarcerated until at least April 2025. As discussed above, such a Hobson's choice violates the First Amendment and RLUIPA. Because Mr. Miller has shown a clear likelihood of a constitutional violation, he has shown irreparable harm. *See Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960).

### iii.   Balance of Equities and the Public Interest

Where, as here, the government is a party, the "balance of the equities" and "public interest" prongs of the preliminary injunction test merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating the balance of the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. It is always in the public interest to uphold constitutional rights. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

Granting this preliminary injunction would require "WVDCR to change its rehabilitative programming to accommodate the Plaintiff." [ECF No. 14, at 16]. But contrary to Defendants' assertion, such changes would not "negatively impact the

WVDCR's ability to carry out one of its most important functions: the rehabilitation of inmates prior to their release." *Id.* "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal citation omitted). Given Mr. Miller's likely—if not inevitable—success on the merits of his claims, the requested injunction would do no more than require the defendants to fulfill their existing constitutional obligations.[4] By contrast, denying the preliminary injunction would prolong the defendants' ongoing deprivation of Mr. Miller's rights and sanction their commission of new violations against other individuals. Furthermore, final adjudication of this matter may not occur before Mr. Miller's projected release date of April 2025; thus, denying him preliminary relief could, in effect, deny him any possibility of a remedy. *Cf.* [ECF No. 5-1, ¶ 17 ("Completion of the RSAT program usually takes approximately six to nine months.")].

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24–25. Such relief is especially extraordinary when it alters rather than preserves the status quo. *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). Nevertheless, I am satisfied that this is an extraordinary case that warrants extraordinary relief. Because "uncommonly well-settled case law"

---

[4] This court will not, prior to any discovery, definitively determine the constitutional validity of West Virginia's RSAT program; however, Defendants are advised of the likely outcome from these proceedings and reminded that they are free to modify their program at any point.

establishes that "attendance in [AA/NA] programs may not be coerced by the state," *Inouye*, 504 F.3d at 714, 716, Mr. Miller's right to relief is "indisputably clear," *In re Microsoft*, 333 F.3d at 525. A mandatory preliminary injunction is "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant[s] and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *Id.* at 526.

Plaintiff's Motion for a Preliminary Injunction [ECF No. 5] is **GRANTED**.

### C. Scope of Injunction

At bottom, Mr. Miller seeks an injunction that will put a stop to the defendants' unconstitutional conduct. To that end, he proposes two possible forms of preliminary relief. [ECF No. 5]. Mr. Miller asks the court to order Defendants to accommodate his beliefs by either "[r]emoving from Plaintiff's IRPP any indication that participation in or completion of the RSAT program is to be a factor in his reentry," or allowing him to complete a secular treatment program. *Id.* The latter form of proposed relief would include the following:

> A) Recognizing and crediting Mr. Miller for the Twelve Step sessions he has attended, and the prior days in which he was enrolled in the RSAT program;
>
> B) For the remaining balance of Twelve Step meetings Mr. Miller is required to attend in order to complete the RSAT program, permitting him to attend, virtually or in person, an alternative secular substance use disorder treatment session;
>
> C) Excusing Mr. Miller (or otherwise refrain from penalizing Mr. Miller for refraining) from participation in

56

morning and evening devotionals that focus on, promote, or inculcate theistic beliefs or tenets; and

D) Adopting policies preventing participants in the RSAT program from being subject to religious coercion through mandatory participation in religious elements and activities.

*Id.*

For several reasons, the court finds it more appropriate to enjoin the defendants from conditioning Mr. Miller's eligibility for parole upon his completion of the RSAT program. As an initial matter, federal courts should hesitate before inserting themselves into the day-to-day operations of state agencies. *See Pro. Ass'n of Coll. Educs., TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 273 (5th Cir. 1984) ("Intrusion of federal courts into state agencies should extend no further than necessary to protect federal rights of the parties."). Although eliminating Plaintiff's RSAT requirement altogether may seem to diverge more dramatically from the status quo, this path involves much less intrusion into internal affairs of the state.

Moreover, this avenue will ensure Mr. Miller the meaningful relief to which he is plainly entitled. As just discussed, completing RSAT takes several months. Even if Mr. Miller were to receive immediate accommodation and begin secular treatment tomorrow, he is unlikely to complete the program prior to his next interview with the Parole Board Panel. And even if he becomes eligible for parole next year, he will have already served nearly four years of his projected five-year sentence. Although Mr. Miller has no entitlement to parole, the record strongly suggests that he would

57

already have been released, but for maintaining his objections to an unconstitutional policy. *See* [ECF No. 5-2 (indicating that Mr. Miller's December 2021 parole interview resulted in "a Deferred/Contingent Status, subject to obtaining an approved place of residency and completing RSAT")]. Had Mr. Miller simply submitted to Defendants' coercion and completed RSAT, he likely would no longer be incarcerated, and WVDCR could continue its patently impermissible practices for years to come. Mr. Miller should not be further punished for bringing this troubling policy to light.

Finally, while the court acknowledges the vital importance of rehabilitating inmates, this goal will not be undermined in this case. Mr. Miller is currently incarcerated for reasons having nothing to do with his substance use and "[p]rior to his incarceration, he took advantage of secular substance use disorder treatment methods and remained sober for four years." [ECF No. 6, at 12]. He made multiple attempts to "grin and bear it and complete the RSAT program despite its pervasive religious content." [ECF No. 5-1, ¶ 36]. While participating, he went beyond his official duties and organized an additional group called Providing Answers for Transitioning Home. [ECF No. 5-6]. He has repeatedly maintained his willingness to complete a secular program, and he has demonstrated substantial knowledge of secular treatment options. *See, e.g.*, [ECF No. 5-8 (discussing various "evidence based treatment methods")]. Given Mr. Miller's demonstrated commitment to his own rehabilitation, whatever marginal benefit could be gained from his completion of RSAT is far outweighed by the harms that would befall him if required to do so.

IV.    Conclusion

Based on the foregoing, Defendants' Motion to Dismiss [ECF No. 13] is **DENIED**. Plaintiff's Motion for a Preliminary Injunction [ECF No. 5] is **GRANTED**. Defendants are hereby **ORDERED** to remove the RSAT program from Mr. Miller's IRPP and to ensure that participation in or completion of the RSAT program is not considered as a factor in his eligibility for parole. Plaintiff's motions for leave [ECF No. 19] and for argument [ECF No. 26] are **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER:     July 18, 2023

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE